## Case No. 4,926.

FORBES et al. v. MEMPHIS, E. P. & P. R. CO. et al.

[2 Woods, 323.][1]

Circuit Court, W. D. Texas. May, 1872.

Courtlandt Parker, for complainants.
Gray & Davenport, for receiver.

BRADLEY, Circuit Justice. The bill in this case was filed against the Memphis, El Paso & Pacific Railroad Company, a corporation of Texas, by a stockholder, a bondholder and the trustees for the bondholders, under the land grant mortgages of said company, on behalf of themselves and all other stockholders, creditors and bondholders thereof, alleging various gross acts of fraudulent management and fraudulent contrivance and misrepresentation on the part of the directors, officers and agents of the company, whereby the said bondholders, mostly citizens of France, had been induced to

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

purchase its land grant bonds to the amount of over $5,000,000, under a representation and pledge that the money should be devoted to the construction of the road, so as to secure the grant of the lands which formed the basis of the mortgages and the only security for the payment of the bonds. The bill charges that the money thus procured constituted the only pecuniary means and resources of the company, and this money, instead of being used for the purpose to which it was pledged, was being utterly squandered, wasted and embezzled by the said officers and agents, with the assent and connivance of the directors, and that the bondholders, as well as the bona fide stockholders, were in danger of losing every cent of their money by the said fraud and embezzlement; that the company had been rendered utterly insolvent thereby, and that the lands would be entirely forfeited by nonperformance of the required conditions, and that there was no means of saving anything from the wreck for the bondholders and other creditors, unless the officers were prohibited from further meddling with the concerns of the company, and a receiver were appointed to take what property and rights remained, and either go on and construct the road, or sell the franchises and property, subject to the mortgages and debts, to some company or association that would go on and complete the work, and thus secure the benefits which formed the entire value and security of the bonds and obligations of the company. The bill prayed for an adjudication of the matters charged, for relief, and for an injunction and receiver.

If the allegations of the bill are true (and their truth seems to be strongly sustained by all the evidence which has been presented), the corporation, through its officers, directors and agents, and by means of pretended contracts, has carried on a vast scheme of fraud, by which millions of dollars have been abstracted from an unsuspecting community, reposing confidence in the character of American institutions and securities.

The interest and reputation of the country, as well as the direct injury sustained by the complainants. require that an adequate remedy, if such a remedy exists in our system of legal procedure, should be promptly and firmly applied to the case.

The bill, with the proper verifications and with due notice to the company, was presented to the court in July, 1870.

The injunction prayed for was granted, and a receiver was appointed to take charge of and administer all the assets, property and franchises of the company. The proper process being served, and no defense or appearance tendered, a decree pro confesso was entered, as of course, at the November rules, 1870.

On January 24, 1871, the receiver, by a memorial or petition duly verified by oath, reported his proceedings, and the state of facts which he found to exist, with reference to the company's affairs, fully sustaining all the allegations of the bill, and exhibiting in detail the various operations of the company, its condition and resources, the disposition that had been made of its stock, property and funds, and the liabilities which it had incurred, showing that it was hopelessly insolvent, that its property and assets, to a considerable amount. had been in part sequestered in Paris, in part attached in New York, and in part detained for duties in New Orleans; that its offices were closed, that it had done comparatively nothing towards the accomplishment of its objects, and that its operations had been entirely suspended for more than a year.

From this report it appeared, amongst other things, that prior to the late civil war, the company had surveyed a route from the eastern boundary of Texas to El Paso, and had made return of the same to the general land office of Texas, and that the commissioner of said office had officially recognized the said line, and that thereby the limits of the reservation of lands for the company's benefit had become defined; and it further appeared, that before the breaking out of the war. the company had graded about sixty-five miles of its road, and that what was done so far was by virtue of a contract with one Thomas C. Bates; it further appeared that, to secure the fulfillment of that contract on the company's part, it had, in 1860, executed bonds to the amount of $350,000, and a trust deed or mortgage to secure the same upon all the lands and property of the company, or any lands or property that might thereafter be acquired by it; it further appeared that none of these bonds or any interest thereon had ever been paid, but that they remained on deposit in a New Orleans bank, and that Bates was engaged in litigation with the company in regard to his claims for construction or upon his contract.

This appeared to be the result of all that was done prior to the war.

Since the war, about twenty or twenty-five miles of road had been graded, about three miles of track had been laid down, and loose rails had been dropped along the line for a few miles further. Ten locomotives. purchased in France, together with a lot of about one hundred and twenty tons of railroad iron. had been detained at New Orleans for nonpayment of duties, which, in the case of the locomotives, exceeded their value. The other railroad iron had been sold or attached in New York for claims against the company. This, from the report of the receiver, seemed to have been the whole extent of the real operations of the company in the construction of its vast work across the whole northern portion of Texas, an extent of nearly a thousand miles, and in the

accomplishment of this result, or at least so much of it as had been performed since the close of the war, there had been issued forty millions of stock and about thirteen millions of bonds and land certificates.

Nothing else remained, as the result of this vast issue of securities, which the receiver could lay his hands on, except a few thousand shares of stock in the Memphis & Little Rock Railroad Company and in the San Diego & Gila Railroad Company, and a residuum of less than three hundred thousand dollars of cash assets accruing from the land grant bonds sold in France. A more utterly fraudulent concern, a more empty bubble of speculation, is rarely to be met with in this highly speculating and fraudulent age.

And yet, as appeared from the report, there are franchises and rights to grants of land belonging to the organization, which, in the hands of an honest and energetic association, backed by sufficient capital, could probably be made available to pay off most of the real indebtedness of the company, and relieve it and the country of the odium which the present concern has brought upon both. In the struggle of capitalists for the establishment of rival trans-continental lines between the Atlantic and Pacific Oceans, the franchises of this company might be rendered available to supply a valuable link in one of them.

The disposal of these franchises, and the remnants of property left, to an association organized with sufficient capital and influence to accomplish such a purpose, the receiver thought, and so reported to the court, was the only means left of realizing from the property and franchises of the company the slightest security or hope of meeting its just obligations. In this view of the case the court was decidedly disposed to agree with the receiver.

It is true that such an arrangement would have the effect of leaving the entire stockholding interest without anything to show for their stock; but that result, if the company was really insolvent and really a bubble company, seemed to be inevitable in any event.

The course proposed might save the claims of honest creditors, and would really be the only means of doing so, whilst it could do no real injury to the stockholders.

A disposition of the franchises and property of the company, in the manner and on the basis suggested, the receiver reported, could be made. A company had been incorporated by the legislature of Texas, in July, 1870, entitled the Southern Trans-Continental Railroad Company, the capital stock of which had been subscribed by some of the most wealthy and responsible capitalists of New York City, and which was empowered to construct a railroad on or near the route of the Memphis. El Paso & Pacific Railroad Company, and to purchase the property and rights of said company, such charter being

undoubtedly obtained in view of the insolvency and failure of the latter company. The receiver reported an agreement which could be effected with said new company, which would have the effect of securing the ultimate payment of the debts and obligations of record of the defendant company. The trustees of the two land grant mortgages (all of whom except James M. Pollock, a trustee in the second mortgage, are complainants in the suit) filed a petition at the same time with the receiver, concurring generally in the plan proposed, but insisting that such proceeds of the land grant bonds as had not been dissipated and yet remained should be held by him as a trust fund or guaranty for the construction of the road, according to the solemn pledges originally given, and should not be delivered to the purchasers until that object should be accomplished and the grants of land, on the basis of which the mortgages rested, should be finally secured and rendered complete.

The proposition thus made, after being taken under consideration by the court, and modified so as to require the purchasing company to take the property and franchises, subject to any balance which might remain due upon every valid debt of the defendant company, was approved, and the receiver was authorized to carry it out by the execution of the contracts, so modified, and the sale of the franchises and property of the defendants to the new company. Thus it will be seen that provision was made in the arrangement which was effected, for the ultimate payment of every valid debt of the company.

At this stage of the proceedings, after the passing of the last-mentioned order, and in the latter part of April, 1871, the present interveners appeared and desired to be allowed to become parties to the suit, and to intervene for their respective interests. Having, as the court thought, presented a prima facie case, orders were made in accordance with their request, and the order authorizing the receiver to effect the proposed sale was suspended until the interveners could formally present their case by petition or cross-bill, and be heard in reference thereto.

As soon as the counsel for the complainants and the receiver were informed of these orders for leave to intervene, they applied for a rule to show cause why such orders should not be vacated and set aside; and a rule to show cause was accordingly granted in such case.

The present argument is upon these rules to show cause, and the question to be decided is whether the applicants should have been allowed to intervene or not. The parties thus seeking to intervene are, first, James T. Sanford and John Van Nest, of New York, who allege that they are directors and stockholders of the defendant company, and they seek to intervene for the

protection of their own interest and that of the other stockholders and creditors, on the ground, as alleged in their petition, that in May, 1870, the parties to the suit (except the company) entered into a conspiracy to dispose of the property of the company and convert it to their own use, and that this suit is part of the means used to effect their object, in which they have procured counsel to represent the company; that they have procured a large quantity of the company's mortgage bonds at a small price, which they intend to use for the same purpose; and that the receiver is in collusion with them, and acting collusively for his own interest; that the proceedings in the suit were secretly managed, and the petitioners never heard of the receiver's appointment until long after it was made.

The other parties seeking to intervene are George W. Gerrish, Rogers Fowler and Abraham Rex. Gerrish is the assignee of Thomas C. McDowell, of his share in a certain contract for constructing the company's road, which was made on the 8th of August, 1866, between the company and said McDowell, Fowler and Rex. The petitioners claim that under that contract they are entitled to a large amount of the company's stock which was transferred to and subscribed by them; that they fully performed the agreement on their part, furnished and paid the sum of fifty thousand dollars guaranty or earnest money, as therein provided, and did proceed to and did build a portion of the railroad as required, and hence became entitled to their respective interests. They therefore claim to intervene, as stockholders, for their interest involved in the suit, on the grounds, as stated in their petition, that certain leading officers of the company (who, they admit, have received and converted to their own use, immense sums of money, as stated in the bill of complaint) have fraudulently combined with the receiver to dispose of the property of the company and convert it to their own use; that the suit is employed as part of the said scheme, including the other allegations in reference thereto, made by Sanford and Van Nest, and that the proposed sale to the new company will result in irretrievable loss to the creditors and stockholders, and is intended for the personal advantage of the confederates. Neither of the petitioners questions the main allegations of the bill, unless it be the company's insolvency, but on the contrary, corroborates them.

Testimony has been taken by the respective parties.

In order properly to understand the questions thus raised, it will be necessary to examine the general character of suits and proceedings in equity against corporations in their relation to the interests of the stockholders, and the general right of the latter to intervene therein, pro interesse suo.

A commercial, or other business corporation, is constituted for the specific purpose of suing and being sued, granting and receiving, buying and selling, and doing other business in a corporate name and capacity, totally distinct from that of any or all of its members considered as individuals. A corporation is a person. Its property is not the property of its stockholders. Its rights are not their rights. They have only an indirect interest therein. The rights of a stockholder are to meet at stockholders' meetings, to participate in the profits of the business, and to require that the corporate property and funds shall not be diverted from their original purpose. If the company become insolvent, it is the right of the stockholders to have the property applied to the payment of its debts. I do not know of any other rights except incidental ones, subsidiary or auxiliary to these. Of course, a stockholder has ordinarily a right to a certificate for his stock, to transfer it on the company's books, and to inspect these books. For the invasion of these rights by the officers of the company, he may sue at law or in equity, according to the nature of the case.

But all remedies for injuries to the property or rights of the company must be prosecuted in the name of the company, and all demands against the company must be prosecuted against the company, by name, unless its officers or agents, by fraud and misrepresentation, have rendered themselves personally liable. A stockholder, in his character of stockholder, cannot sue, nor, unless specially made liable by the charter, can he be sued for any of the company's transactions. There is one case, and one only, in which he can interpose, and that is where the officers and managers of the company, by fraud and collusion with third persons, are sacrificing, or are about to sacrifice and betray the interests of the corporation. For such breach of trust and conspiracy, he can call the guilty parties to an account in a court of equity.

In the case before the court, the complainants might possibly have held the officers and agents of the company personally liable for the frauds and misrepresentations charged against them. But the said officers and agents were clothed with all the authority and power of the corporation, and negotiated and operated in its name, and issued its obligations upon its corporate credit, and in every official way involved and pledged its corporate liability, and being the legal representatives of the corporation, placed before the world as such by the corporation, the parties injured had a perfect right to proceed against the corporation for redress. It cannot be, and is not seriously pretended, that the principal complainants in the case, the trustees of the land grant mortgages and bondholders, are acting in collusion with the officers of the company, or that they have any other object in view than the pro-

tection and security of the bondholders, who, it is admitted, have been most outrageously defrauded out of their money.

Here, then, we have a suit brought by grossly injured parties, against the proper defendant, for relief, which, according to the view of the court, it is competent to give. The petitioners were not proper parties, and could not have been made parties without rendering the bill obnoxious to a demurrer.

It is not alleged that the complainants are colluding with the officers of the company, or that they are guilty of any improper conduct. On the contrary, the institution of the suit and its general objects appear to be approved by the petitioners. They admit all the most serious charges made by the bill.

Nor can it be pretended that the suit was not properly instituted; process was served or duly acknowledged by the president of the company. The justice who granted the original injunction and appointed the receiver declined to proceed until that officer had been personally notified of the proceedings, and had waived all objections to a hearing of the motion out of the circuit limits. Besides this personal notice and waiver, the counsel of the company, who had been recognized as such in various proceedings in other courts, appeared and made no objection to the hearing, but acquiesced therein.

Service of process and notice upon an insolvent corporation, which has ceased to carry on business, and is fast undergoing the process of disintegration, is not always an easy matter; but it is believed that not only the president, but all the principal officers of the defendant corporation were apprised of the institution of the suit, and of the proceedings thereon.

Sanford and Van Nest, who claim to be directors, allege that they were not made aware of them until some time after the receiver had been appointed. But it was not essential that they should be notified, and it is not pretended that it was by reason of any fault or neglect of the plaintiffs that they were not notified.

It seems to me that the suit was regularly instituted against the proper party, and that there was no collusion or fraud in the institution thereof; so far, then, as the plaintiffs are concerned, the petitioners are not entitled to intervene in the suit, or to interpose any obstacle to its termination.

The receiver appointed by the court entered upon a vigorous prosecution of his duties, took possession of all assets of the company which he could find, inquired and examined into all its transactions, and ascertained, as near as possible, the exact state of its affairs, and amount of its stock and outstanding obligations. All this was duly reported to the court in the memorial before referred to, and went to establish and confirm all the allegations of the bill which had been taken pro confesso against the defendant corporation in regular course. After a decree pro confesso, it is often proper for a court to inform itself through its own officers, as by report of a master, or by deposition, or other inquest or proceeding, more particularly as to the exact facts of the case.

The report of the receiver in this case was regarded as a proper presentation and authentication of the facts upon which to base further proceedings.

An order was thereupon made in general accordance with the receiver's recommendation, but also in accordance with the best judgment of the court. The objection of the petitioners seems to be more particularly directed against this order, whereby the receiver was authorized to dispose of the assets, property and rights of the corporation defendant, upon the terms stated in the order and the contract referred to therein.

They made charges of fraud against the receiver; they say that he is in collusion with the officers of the company who were guilty of the frauds charged in the bill, and that he is combining with them to dispose of the property of the company and convert it to his and their own use.

The question, then, as a legal one, is reduced to this: The suit being properly instituted, the relief prayed being proper to grant, a receiver being properly appointed, a decree pro confesso being regularly entered, an authentic report of the facts being made to the court, and its judgment being passed thereon, can individual stockholders be now permitted to intervene in the suit and file a cross-bill in the cause on a general charge of fraud and collusion on the part of the receiver, and erroneous judgment on the part of the court in making the order referred to? It seems to me that this would be carrying the practice of intervention too far.

It is true that the complainants filed the bill in this case on behalf of themselves and of all others being stockholders, creditors or bondholders of the corporation defendant, who might desire or be entitled to intervene. But it was never contemplated, nor is it the proper practice, that the persons embraced in that category should intervene to set aside the proceedings, or to interpose obstacles to the progress of the suit. The complainants, by suing as representatives, open the door to all other parties named to come in and take the benefit of the proceedings and decree, not to oppose and nullify them. In a suit so instituted, parties may come in and prove their claims or status, and participate in all the dividends and benefits to be derived from the suit.

Rival creditors, by proceedings before a master, may control the priority of their respective liens, and creditors or stockholders may contest the validity of the claims of other creditors and stockholders, but all in subordination to the general object and pur-

pose of the suit, to obtain an administration of the company's assets and property.

·To be allowed to intervene as general defendants and contestants is another and different thing. This can be admitted only upon the ground before referred to, to wit: having an interest in the results as a stockholder or otherwise, and being able to show fraud and collusion between the plaintiffs in the suit and the officers of the company having charge of its interests. A suggestion, in the progress of the suit, that an officer of the court is disposed to act fraudulently, or that the court has made an injudicious or erroneous order, will not be a sufficient ground to allow such a party to intervene. Indeed, it is questionable whether, in any case where a suit is properly instituted against a corporation, a stockholder of that corporation can, even on a suggestion of fraud on the part of its officers, come in by way of intervention as party to that suit, and seek to defend or control the proceedings. An original bill would rather seem to be the proper mode of proceeding.

In this case, however, the complainants deny that the petitioners are stockholders of the company, and to this question much of the evidence on both sides has been directed.

An examination of this evidence convinces me that the right of the petitioners to any stock of the company is very doubtful. At all events, I see nothing in the case that should entitle them to interfere with the judicial administration of its assets for the security of its deceived and defrauded creditors.

The petitioners, if entitled to be regarded as stockholders, became such under circumstances that should have put them on their guard as to the irregularities and frauds of the company.

And it is in the discretion of the court, whether or not to permit a stockholder to become a party defendant in any case where he is not made such by the bill. And as it is held to be an extreme remedy, to be admitted by the court with hesitation and caution. I think I ought not to have allowed it in this case, and ought now to vacate the order for such allowance. "Generally speaking," says Calvert, "a stranger can take no part at all, and cannot even be heard by counsel in a claim of interest in the suit except by the consent of all parties." Calv. Parties, 58. Deviations from the rule are occasionally allowed in order to obviate delay and expense when there is no question as to the rights of the parties; but, on the whole, I do not deem it necessary to depart from the general rule in this case, when the interests of all parties, and especially of the bona fide creditors of the corporation in question, are so obviously coincident with the objects of the suit and the orders and arrangements which have been made.

From a careful examination of the whole testimony, I am also satisfied that the charges of fraud and conspiracy made against the receiver are entirely groundless. It is unnecessary for me to examine and comment upon it in detail.

The orders for leave to intervene and file answers or cross bills will be vacated, and the sale and agreement made by the receiver will be confirmed, subject to the following modification, to wit: that no sale of the property or franchises shall be made by the said receiver to any other party or company than the said Southern Trans-Continental Railroad Company, without the approval and confirmation of this court, and subject to the same obligations to pay all valid debts of the defendant corporation which were to be assumed by said Southern Trans-Continental Railroad Company, which obligation shall be a lien on the said property and franchises for the fulfillment thereof; and the said receiver is to discontinue any actions or proceedings against the said Sanford and Van Nest for the amount of stock claimed by them.