# KENT *v.* LAKE SUPERIOR SHIP CANAL, RAILWAY AND IRON COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

No. 149. Argued January 8, 1892. — Decided March 14, 1892.

Remedy for error in a decree for the foreclosure and sale of property mortgaged to a trustee for the benefit of holders of bonds issued under the mortgage, or in the sale under the decree, must be sought in the court which rendered the decree and confirmed the sale.

A canal company which had issued several series of bonds, secured by mortgages on its property, defaulted in the payment of interest on all. Bills were filed to foreclose the several trust deeds, and a receiver was appointed. On due notice to all parties receiver's certificates were issued to a large amount for the benefit of the property, which certificates were made a first lien upon it. The property was sold under a decree of foreclosure and sale, and the purchasers paid for the same in receiver's certificates, the amount of the bid being less than the amount of the issue of such certificates. On a bill filed by a holder of bonds issued under one of the mortgages foreclosed, *Held,*

(1) That his remedy should have been sought in the court which rendered the decree;

(2) That the paramount lien of the receiver's certificates having been recognized by the trustee of the mortgage under which the bonds were issued, his action in that respect was, so far as appeared, within the discretion reposed in him by his deed.

THIS was a bill in equity brought in the Supreme Court in and for the county of Kings, New York, February 7, 1884, by Andrew Kent as executor and trustee of the last will and testament of Jonathan T. Wells, deceased, against the Lake Superior Ship Canal, Railway and Iron Company; Theodore M. Davis; Theodore M. Davis as receiver of the Ocean National Bank of New York; J. Boorman Johnston, Isaac H. Knox and Gordon Norrie, being the surviving partners of the firm of J. Boorman Johnston & Co.; Frederick Ayer, sole surviving partner of the firm of J. C. Ayer & Co.; Frederick F. Ayer, Josephine Ayer and Benjamin Dean, administrators, with the will annexed, of the estate of James C. Ayer, deceased; and Thomas N. McCarter; and subsequently removed into the Circuit Court of the United States for the Eastern District of New York.

The bill alleged that July 6, 1864, the Portage Lake and Lake Superior Ship Canal Company was organized as a corporation under the laws of Michigan for the purpose of constructing a ship canal to connect the waters of Portage Lake and Lake Superior; that by an act of Congress, approved March 3, 1865, two hundred thousand acres of public land were granted to the State of Michigan "to aid in building a harbor and ship canal at Portage Lake, Keweenaw Point, Lake Superior," subject to the condition, among others, that they should revert to the United States in case the said canal and harbor should not be completed in two years from the passage of the act; that by an act entitled "A bill to accept a grant of land by act of Congress to aid in the construction of the ship canal at the head of Portage Lake with Lake Superior, and to provide for the construction of the same," passed March 16, 1865, by the legislature of Michigan, the grant was accepted and conferred upon said Portage Lake and Lake Superior Ship Canal Company, subject to the condition "that none of said lands shall be sold or otherwise disposed of, except

for the purposes of hypothecation, until said canal shall be completed as therein provided;" and that July 1, 1865, the company executed a deed of trust conveying to C. C. Douglas and his successors its canal and franchises and the two hundred thousand acres of land to secure the payment of one thousand bonds of five hundred dollars each, John L. Sutherland being thereafter substituted as trustee.

The bill further averred that by act of Congress, approved July 3, 1866, a second two hundred thousand acres of land were granted to the State of Michigan for the above purposes, and it was provided by the act that this second grant should enure to the use and benefit of the company in accordance with the act of the Michigan legislature of March 16, 1865; that July 1, 1868, the company executed a deed of trust of the second land grant, together with the equity in the canal and other property already conveyed to Douglas in trust, to Martin and Davis, to whom Lucien Birdseye subsequently succeeded as trustee, to secure one thousand other bonds of five hundred dollars each; and that Jonathan T. Wells purchased eighty of these last-named bonds, and paid cash therefor, which money was applied by the company in the construction of the harbor and canal. It was further alleged that July 1, 1870, the company made its third deed of trust, conveying its canal and the two land grants to Charles L. Frost, to secure twelve hundred and fifty bonds of one thousand dollars each, two hundred and fifty of which were paid, redeemed and cancelled by the company by bonds of a subsequent issue, known as the "Union Trust bonds;" that Thomas N. McCarter succeeded Frost as trustee, July 1, 1872; and that Wells became the holder and owner of forty of the bonds secured by this third trust deed. The bill continued that on or about April 29, 1871, the name of the company was changed to "The Lake Superior Ship Canal, Railroad and Iron Company," which on May 1, 1871, became seized and possessed by purchase of the entrance canal by way of Portage River into Portage Lake with the franchises appertaining thereto, and also acquired title to two hundred thousand acres of land or thereabouts, situated in the State of Michigan, and known as the "Wagon

Road Lands;" that May 1, 1871, the company executed a deed of trust to the Union Trust Company of New York as trustee, conveying the canal with all rights and franchises thereunto appertaining, and the six hundred thousand acres of land, to secure the payment of bonds which the company proposed to issue to the number of thirty-five hundred at one thousand dollars each, of which there were afterwards issued and negotiated thirteen hundred and no more.

It was further averred that between 1865 and 1872 the company hypothecated certain of the bonds issued under the first three deeds of trust, and during the years 1871 and 1872 hypothecated certain of the bonds issued under the fourth deed of trust, and only a small proportion of the bonds of each issue was ever sold outright by the company; that in November, 1871, and on January 18, 1872, the company defaulted in the payment of the interest then due upon these bonds; and that at that time large amounts of them were held by the Ocean National Bank, Johnston & Co. and Ayer & Co. as collateral to certain loans, which plaintiff charges were of doubtful legality, made by the parties to the canal company at different times before the default, and it was claimed by the company that the bonds pledged as security for the loans were issued unlawfully, and in violation of the law of Michigan.

That in December, 1871, the Ocean National Bank failed, and T. M. Davis was appointed its receiver; and among the assets of the bank were bonds under all the aforesaid deeds of trust, but most of them were under the McCarter and Union Trust Company deeds; and that some of the bonds in the possession of the bank were owned by it, but by far the larger part were held as collateral.

That prior to the default the company had selected with care and at much expense the lands it was entitled to, and they were regarded as of great prospective value, and those selected under the act of Congress of July 3, 1866, were especially valuable.

That early in 1872, Davis, receiver, Johnston & Co. and Ayer & Co. retained an attorney at Detroit to protect their interests as creditors and bondholders of the company, and to act for and represent them in prospective legal proceedings in

the United States courts for the Eastern District of Michigan for the foreclosure of the deeds of trust, who was afterwards retained and employed by Sutherland, Birdseye and McCarter, and the Union Trust Company, trustees, as their solicitor to foreclose the several trust deeds, which employment was by Davis, receiver, Johnston & Co. and Ayer & Co., and upon their retainer and in their interest, without reference to the interests of the other bondholders; and it was agreed between them and the trustees that the foreclosure suits were to be prosecuted under their direction and for their special benefit; and to this end they indemnified the trustees against all loss and damage by reason of anything which Davis, Johnston and Ayer might do in the premises.

That on or about May 25, 1872, a bill was filed in the Circuit Court of the United States for the Eastern District of Michigan in the name of Sutherland, trustee, by said solicitor, to foreclose the trust deed of July 1, 1865, and the company, Birdseye, Frost and the Union Trust Company, as trustees, were made parties defendant. As Birdseye was a citizen of New York, it was alleged that Sutherland, who was also a citizen of New York, was a citizen of New Jersey; that on or about June 13, 1872, one Knox was appointed receiver, and it was admitted by Birdseye's solicitors that Sutherland was a citizen and resident of New Jersey, though plaintiff charges that the admission extended only to the order appointing the receiver, and that the Circuit Court was afterwards shown by the pleadings and proofs to have no jurisdiction therein, and had none in fact; that on June 17, 1872, an order was made empowering the receiver to execute an instrument to F. D. Tappan, as trustee, to secure certificates of indebtedness authorized to be issued for the purpose of completing the construction of the canal, and certificates were issued to the amount of about $640,000, which were purchased by Johnston & Co. and Ayer & Co., $500,000 of the issue being sold at the rate of seventy-five cents on the dollar, and the remainder at the rate of sixty cents on the dollar, though twenty-five per cent discount was the limitation prescribed; and that all this was in the interest of Davis, Johnston and Ayer.

The bill further averred that on August 27, 1872, the company was ·adjudicated· a bankrupt by the Michigan District Court, and ͺJerome and Beaman were appointed assignees, who on January 3, 1873, by supplemental bill, were made parties to the Sutherland suit, as was McCarter, trustee. It was further stated that on July 3, 1872, a bill was filed in the Circuit Court in the name of McCarter, trustee, by the same solicitor, to foreclose the ͺtrust deed of· July 1, 1870, and the company and the Union Trust Company were made parties defendant, as were the assignees, January 13, 1873.·

The bill also alleged that on July 5, 1872, a bill was filed in· the Circuit Court in the name of Birdseye, ͺtrustee, by the same solicitor, ͺto foreclose the trust deed of July 1, 1868, and · the ͺcompany, McCarter, trustee, and the Union Trust Company were made parties defendant... This bill set up the ap- ·pointment of Knox as receiver, his taking possession of the ·property,ͺ the issue by him of certificates of· indebtedness to the amount ͻf $500,000, and that the certificates were made, by order of court, a paramount lien upon the ͺcanal and all the property of the company ; and prayed that the certificates ͺmight first be ratably paid from the proceeds of the sales of ·the lands acquired by the Sutherland and Birdseye deeds of ͺtrust ; ͺand plaintiff charged that this recognition of the cer- ·tificates was entirely unauthorized and never ratified by Wells.

. · It was further alleged that· on August 5, 1872, Birdseye, · trustee, filed an answer in the Sutherland suit ͺin which he set up ·the defence of want of jurisdiction, in that Sutherland was not ·· a citizen of New Jersey, but of New York, and it was stated · that this was ·shown in 1874 by the testimony of Sutherland.ͺ

· · The bill· then charged that the Circuit Court did not obtain jurisdiction or power over the Birdseye lands or the bond- holders·secured thereby, so as to enable the court to extend the lien of the·receiver's certificates over those lands, or make them a prior or paramount lien thereon ; that neither Wells nor any other of the Birdseye bondͺholders, except those rep- resented by the aforesaid solicitor, were parties to the Suther- land suit,· and Birdseye was not authorized nor empowered to · represent them in respect thereto ; that Birdseye allowed· the

paramouut lien to be apparently imposed upon the lands he represented, but failed to apprise the bondholders of the action of the court, although he knew such action was to be brought about in the interest of some bondholders to the sacrifice of that of the others; and that the nominal amount of the certificates was illegally increased for the purpose of making the indebtedness as large as possible, so as to obtain the entire property of the company and destroy the interest of the other bondholders; and that, although the accounts of the receiver were afterwards audited and confirmed by the court, Wells was not bound thereby.

That the Birdseye and McCarter trust deeds provided for the release of lands upon the delivery of bonds for cancellation at the rate of five dollars per acre; that on or about August 11, 1873, Wells deposited forty bonds secured by the McCarter trust deed for one thousand dollars each, with Birdseye, as trustee, and at the same time tendered to him for cancellation eighty bonds for five hundred dollars each, secured by the Birdseye trust deed, and received from him a release of eight thousand acres of land from the incumbrance and operation of that trust deed, except only a lien to the amount of the bonds tendered, or that the amount of said bonds became immediately due and payable; and that eight thousand acres became released from the lien of any other of the deeds of trust, and the remainder of the property became discharged from any lien for the eighty thousand dollars.

It was further alleged that in September, 1873, the assignees in bankruptcy filed a bill in the Circuit Court against Sutherland, Birdseye, trustee, McCarter and the Union Trust Company, as trustees, Wells, F. D. Tappan and others, which set forth in detail the matters relating to the release of August 11, 1873, and prayed that it might be declared valid and of the legal effect charged in the bill; that the proceedings in the foreclosure suits might be stayed; and that the Sutherland suit, with this bill treated as a supplemental bill or cross-bill, might proceed regularly to a decree, containing the manner in which the property covered by the several trust deeds should be offered for sale, etc.

That Sutherland, McCarter and Tappan, trustees, appeared in this last-mentioned suit by the same solicitor and answered; that Birdseye, trustee, also appeared, and, in his answer, admitted and realleged the allegations contained in the bill relating to the claims of Wells under the release; that defendant Wells appeared, and on or about December 30, 1874, his solicitor stipulated that the bill filed by the assignees be taken *pro confesso* against him; that issue was joined and a large amount of testimony was taken and filed in the several suits referred to; but that none of the testimony had any bearing on the effect of the release, and its validity was admitted upon the record.

It was then charged that during the latter part of 1876 and the early part of 1877 the solicitor of Davis, Johnston and Ayer, and other parties interested with them, "entered into a fraudulent conspiracy for the purpose of procuring from said Circuit Court the entry of a decree, by means of which the interest of said Jonathan T. Wells in said eight thousand acres of land should be divested, and the value of his said bonds destroyed, and the entire property and assets of said the Lake Superior Ship Canal, Railroad and Iron Company vested in the parties in this article mentioned to the exclusion of said Wells;" that it was agreed, upon the sale of the property, to be made in pursuance of the proposed decree, that it should be purchased by Wilson and Man, as trustees, for the benefit of the parties to the said fraudulent decree; that a company should be organized, under the laws of Michigan, for the purpose of taking and holding the property formerly held by the canal company; and that, upon the completion of said transfer the parties to said agreement would endeavor to sell the property to English capitalists, and, failing in this, the stock should be divided between the parties to the agreement.

That in pursuance of this scheme, the solicitor represented to the Circuit Judge that an arrangement had been made to sell the whole property of the canal company to English capitalists for a sum sufficient to pay the entire debts of that company, and that to carry out this agreement it was necessary to sell the whole property of the company under a decree

of the court, and that such decree would be satisfactory to all parties interested; that by these representations, without any notice to Wells or his solicitor, an order was obtained from the judge, at his house, February 12, 1877, that the bill filed by Jerome and Beaman be treated as a cross-bill in the Sutherland, the Birdseye and the Union Trust Company foreclosure suits, and that the four causes be heard together upon the pleadings and proofs in all, and at the same time and place a decree was signed by Judge Emmons, entitled in the four suits, which contained the following clause:

" *Twenty-first.* It is hereby ordered, adjudged and decreed, that the attempt of the defendant, Jonathan T. Wells, to redeem or obtain release of certain lands from the lien of the mortgage of the first of July, 1868, and the alleged release of said land by Lucien Birdseye, trustee, as set forth in said cross-complaint, having taken place after the institution of the suit for the foreclosure of said mortgage, were and are ineffectual and void."

That the decree further adjudged that the receiver's certificates for the amount of $934,478 — principal and interest — were a first lien upon the canal and the first and second land grants, but not a lien upon the third land grant, and required that the lands covered by the Birdseye mortgage should be sold separately, and gave various directions as to the method to be adopted by the master for distributing the proceeds; that the sale was advertised under the decree in but one paper, and that a village newspaper of limited circulation, and the parties refused to advertise more extensively; that they gave no notice of the terms of sale; that they required at the sale the whole amount of the purchase money to be paid at once, without giving the purchaser any opportunity to examine the title, and refused to sell the second land grant separately; that at the sale thus conducted, Man and Wilson bought the entire property of the canal company for $550,000, which they paid in receiver's certificates; that the master's report was confirmed before the expiration of the usual time, upon a representation to the solicitors of the other parties that this was necessary to the consummation of a sale to the English

capitalists; that they then, in combination with the other members of the party, formed a new company, which is one of the demurring defendants; and that they conveyed all the property of the old company to the new corporation, which had notice of the fraud, paid no new consideration and took title subject to the rights of Wells.

It was also alleged that Wells died in Brooklyn, New York, on October 16, 1881, at the age of about eighty-two years, and that "for three years and upwards immediately preceding his death he was feeble in body and mind, and by reason thereof was unable to travel to Michigan, where the litigation hereinbefore referred to was carried on, or to give his personal attention to his interests therein;" that in March, 1879, Wells transferred his property to James H. Gilbert for the benefit of himself and his legal representatives, and "knowledge of the making and entry of said decree was first acquired by said Jonathan Tremaine Wells and by said James H. Gilbert, trustee as aforesaid, during the month of May, 1879; that it has been exceedingly difficult and has required much time to ascertain the facts in relation to the proceedings herein related on account not only of the many and protracted litigations," but especially of the efforts "made by the parties to the fraud aforesaid to suppress everything tending to throw light upon their transactions and to hamper and impede investigation by withholding or concealing whatever might give information to Wells or his representatives."

The bill also set forth that on March 10, 1882, a petition was filed in the Circuit Court of the United States for the Eastern District of Michigan, on behalf of Gilbert, trustee, as aforesaid, and an application for relief against said last-mentioned decree was made thereon; and that this application was heard by the Honorable Stanley Matthews, one of the judges of the Circuit Court, and an order made denying it, "but without prejudice to the merits of the application or proceedings to be taken thereafter in the interest of the estate of said Jonathan Tremaine Wells."

The forty-first paragraph of the bill alleged that after the execution of the Birdseye release McCarter became seized of

the eight thousand acres described in the release, in fee simple, in trust for Wells, and in further trust to sell said lands and pay Wells the eighty thousand dollars and interest; that it was his duty, as trustee, to cause the said lands to be suitably advertised, and to use diligence to prevent the creation of any lien prior to that of Wells; that Davis, Johnston and Ayer took upon themselves the performance of the duties of said trust; that said land at the time of the sale was worth at least $150,000, and that amount could have been realized with reasonable diligence; that they became trustees for Wells and had no right to buy said lands; that they did buy them and caused them to be conveyed to the company, and have sold a portion of said lands to *bona fide* purchasers for value and received the purchase money; and "that they and said company have thus become and are liable to pay to this plaintiff the full amount due upon the bonds aforesaid, to wit, the sum of eighty thousand dollars, with interest as aforesaid."

The forty-second paragraph stated that the plaintiff was without remedy unless he could set aside the alleged fradulent decree.

The bill prayed that the decree of February 12, 1877, might be adjudged void so far as the release to Wells was concerned, and so far as the receiver's certificates were made a paramount lien or given any right of prior payment, or any validity as payment, as against Wells's bonds and release; that the eight thousand acres released be adjudged to be held in trust for Wells; that plaintiff be declared to succeed to all of Wells's rights, and be decreed a paramount lien on the eight thousand acres for eighty thousand dollars and interest; for an account of profits in dealing with the property held in trust for Wells; for an injunction; and for a money decree against the defendants for said sum of eighty thousand dollars and interest; and for general relief.

Copies of the various trust deeds, of the release, of the orders and decree of the Circuit Court of the United States for the Eastern District of Michigan, and of agreements in relation to the purchase of the lands, etc., were attached.

The cause was heard on demurrer to the bill before Mr.

Justice Blatchford, holding the Circuit Court, who sustained the demurrers and dismissed the bill, whereupon the cause was brought to this court on appeal.

*Mr. Everett P. Wheeler* (with whom was *Mr. John Cummins* on the brief) for appellant.

The facts alleged in the complaint charged a fraudulent conspiracy, carried to a conclusion by certain legal forms, the parties contriving and benefiting by the conspiracy being bondholders who, by a series of fraudulent manœuvres in the Circuit Court for the Eastern District of Michigan, succeeded in depriving the plaintiff of the general and specific liens given him under the Birdseye and McCarter mortgages. They obtained the mortgaged property themselves by the familiar device of issuing receiver's certificates at a ruinous discount, selling the mortgaged property on foreclosure, and buying it and paying for it in such receiver's certificates. As part of this conspiracy the plaintiff charges that these bondholders were acting in the name of Birdseye, who was trustee under the first mortgage on the second land grant, that they therefore owed a duty to Wells to protect his interest, that they violated this duty by admitting the validity and priority of the receiver's certificates as a lien on the second land grant, and by obtaining a decree against Wells from the Circuit Court for the Eastern District of Michigan. This decree was in contradiction of the admissions in the cross-bill, was not based upon or in any way supported by any testimony taken in any of the actions, was in fraud of the plaintiff's rights, and obtained secretly, collusively, by misrepresentation to the court, and without notice to the plaintiff, though he was a party to the action.

The complainant's remedy grows out of the fraud. His right arises out of the errors committed to his prejudice. His complaint asks that so much of this decree so obtained as adjudged that the release by Birdseye was invalid, and that the receiver's certificates were a prior lien, be adjudged fraudulent and void, and that the title acquired under it by defend-

ants be adjudged to be in trust for plaintiff and that they account, etc. The demurrers admit that the allegations of the complaint are true. If they be true, there can be no question but that at some time and in some proceeding, they constituted a cause of action, and entitled the plaintiff to relief from the said decree. The only question is now whether at this time and in this proceeding, the facts set forth entitle the plaintiff to the relief he seeks; or to any relief.

An original bill to impeach the judgment was the proper form of proceeding. The decree was fraudulent and erroneous. The plaintiff's only remedy was by original bill to impeach it. The term at which the decree was entered expired before the fraud and error were discovered. Under these circumstances the remedy was by original bill. *Wright* v. *Miller*, 1 Sandf. Ch. (N. Y.) 103; *Evans* v. *Bacon*, 99 Mass. 213; *Johnson* v. *Johnson*, 30 Illinois, 215; *Sanford* v. *Head*, 5 California, 297; *Bradish* v. *Gee*, 1 Ambler, 229; *Pemberton's Case*, 40 N. J. Eq. (13 Stewart) 520. This bill need not be filed in the same court which rendered the decree complained of. A court of equity has jurisdiction of a suit to impeach for fraud a decree rendered by another court. *Arrowsmith* v. *Gleason*, 129 U. S. 86; *Gaines* v. *Fuentes*, 92 U. S. 10, 20; *DeForest* v. *Thompson*, 40 Fed. Rep. 375; *Wilmore* v. *Flack*, 96 N. Y. 512; *Dobson* v. *Pearce*, 12 N. Y. 156; *S. C.* 62 Am. Dec. 152.

The true reason for this rule is that the court of equity, in reference to actions of this description, does not sit as a court of review. Its acts *in personam*, and wherever it can find the parties guilty of fraud, takes from them benefits which they have procured thereby. The jurisdiction to do this rests on the solid foundation that fraud vitiates all proceedings, whether apparently judicial or otherwise, and that a fraudulent judgment is really no judgment at all. *Earl of Bandon* v. *Becher*, 3 Cl. & Fin. 479.

So in *Johnson* v. *Waters*, 111 U. S. 640, 667, Mr. Justice Bradley says: "The most solemn transactions and judgments may at the instance of the parties be set aside for fraud. . . . In such cases the court does not act as a court of review, nor does it inquire into any irregularities or errors of proceeding

in another court; but it will scrutinize the acts of the parties, and if it finds that they have been guilty of fraud in obtaining a judgment or decree it will deprive them of the benefit of it and of any inequitable advantage which they have derived under it." See also *Gaines* v. *Fuentes*, 92 U. S. 10, 22; *Barrow* v. *Hunton*, 99 U. S. 80, 83; *Metropolitan El. R'y Co.* v. *Manhattan R'y Co.*, 14 Abb. N. C. 103, 216; *Kennedy* v. *Daly*, 1 Sch. & Lef. 355, 374.

This is especially true where parties have misled the court by false statements. *Vadala* v. *Lawes*, 25 Q. B. D. 310; *Abouloff* v. *Oppenheimer*, 10 Q. B. D. 295.

*Mr. John E. Parsons* for appellees.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

By this bill plaintiff, as succeeding to the rights of Wells, seeks relief in respect of so much of the decree of the Circuit Court of the United States for the Eastern District of Michigan of February 12, 1877, as adjudged that the release by Birdseye was invalid, and the receiver's certificates a prior lien.

It appears that the canal company defaulted in the payment of interest due upon its several issues of bonds; that bills were filed to foreclose the trust deeds securing them; that receiver's certificates were issued by order of court; that a decree was entered in all the causes heard as one cause; and that the property was advertised and sold under the decree.

The right to a decree and sale cannot be controverted, and at the sale any or all the bondholders had the right to buy. If there was error in the decree, or in the sale, the remedy of plaintiff was in the court which rendered the decree and confirmed the sale. *Blossom* v. *Milwaukee Railroad Co.*, 1 Wall. 655; *Christmas* v. *Russell*, 5 Wall. 290, 305; *Michaels* v. *Post*, 21 Wall. 398, 427; *Robinson* v. *Iron Railway Co.*, 135 U. S. 522, 531. Application was made to that court and was denied, but no further step was taken.

Suit to foreclose was commenced by Sutherland, May 25, 1872, the trustees in the other trust deed, Birdseye, Frost and the Trust Company being parties defendant. The receiver was appointed in this suit June 13, 1872, and on June 17 the order was entered for the issue of the certificates for the purpose of completing the construction of the canal. This order declared "that the indebtedness created by said receiver's certificates shall constitute a first and paramount lien over all other liens and incumbrances upon the ship canal, real and personal property, and franchises of said defendant corporation, and on all the future earnings and income thereof, and shall be entitled to priority and payment over all other claims out of said real and personal property, earnings and income, etc..; and in case said canal, real and personal estate, and franchises or any part thereof shall be sold under and in pursuance of any judicial decree said certificates of indebtedness remaining unpaid shall first be paid out of the proceeds of sale," etc.

"Under the provisions of the acts of Congress granting the lands covered by the mortgages," said Mr. Justice Strong, speaking for the court in *Jerome* v. *McCarter*, 94 U. S. 734, 738, "the lands reverted to the United States, unless the ship canal should be finished within a fixed period, and that period was passing away when the order was granted to the receiver to raise money for completing the canal by the issue of certificates secured by his mortgage. The canal was unfinished, and there were in the receiver's hands no funds to finish it. Hence there was a necessity for making the order which the court made — a necessity attending the administration of the trust the court had undertaken. The order was necessary alike for the lien creditors and for the mortgagors. Whether the action of the court could make the receiver's mortgage superior in right to the mortgages which existed when it was made, it is needless to inquire. None of the creditors secured by those other mortgages objected to the order when it was made, though they were all then in court. None of them object to its lien or its priority now."

Johnston & Co. and Ayer & Co. purchased the certificates thus issued for the construction of the canal.

On July 5, 1872, Birdseye, trustee, filed a bill to foreclose his trust deed. August 11, 1873, Birdseye executed the release to Wells. Neither Johnston & Co. nor Ayer, & Co. nor the receiver were in any way parties or assented to this release. It was given a year after the order for the issue of the certificates was entered, as we have said, in a suit to which Birdseye, trustee, and Frost, trustee, (succeeded by McCarter,) were parties.

In *Richter* v. *Jerome*, 123 U. S. 233, 246, a bill was filed by Richter as the holder of two hundred and thirty of the bonds issued under the fourth trust deed, and it was charged that other bondholders had conspired to obtain the mortgaged premises, and that the solicitor who foreclosed was their attorney. This court said, Mr. Chief Justice Waite delivering the opinion: " All the rights the bondholders have or ever had in the mortgage, legal or equitable, they got through the Trust Company, to which the conveyance was made for their security. As bondholders claiming under the mortgage, they can have no interest in the security except that which the trustee holds and represents. If the trustee acts in good faith, whatever binds it in any legal proceedings it begins and carries on to enforce the trust, to which they are not actual parties binds them. *Kerrison* v. *Stewart*, 93 U. S. 155, 160; *Corcoran* v. *Chesapeake &c. Canal Co.*, 94 U. S. 741, 745; *Shaw* v. *Railroad Co.*, 100 U. S. 605, 611. Whatever forecloses the trustee, in the absence of fraud or bad faith, forecloses them."

The paramount lien of the certificates was recognized by Birdseye in the bill exhibited by him, and his action, so far as appears, was within the discretion reposed in him by his deed.

August 27, 1872, the company was adjudicated a bankrupt, and in September, 1873, its assignees filed their bill, setting up the facts relating to the Birdseye release and praying to have it declared valid, to which Wells appeared and stipulated that the bill might be taken *pro confesso* against him; but Birdseye, trustee, McCarter, trustee, the Union Trust Company, trustee, Tappan, trustee for the certificate holders, and others, were parties, and Wells could not cut off their rights or create

rights in his own favor, by admission.   The decree complained of covered this suit as well as the others, and the question of the operation and effect of the release was raised upon the pleadings.

Upon what ground can another court rescind the decree, or set aside the sale, because either is erroneous?

Wells clearly could not insist upon matters which he had or could have insisted upon, prior to the decree, or upon the motion to confirm the sale.   If the confirmation were without notice, he should have applied to the court which entered the order.

Neither Birdseye nor McCarter, the trustees under whose deeds the bonds were issued which Wells held, are charged with fraud or any conduct in bad faith, and neither is a party to this bill.

The matters alleged to be fraudulent are the steps taken to have the property foreclosed and the purchase thereon ensuing, and what is charged is that the holders of large amounts of the bonds and of all the receiver's certificates combined to bring about the foreclosure and to make the purchase.

Epithets do not make out fraud, and the averments are substantially of legal conclusions not admitted by the demurrers, *Fogg* v. *Blair*, 139 U. S. 118, 127, and in themselves insufficient as stating a case of fraud practised directly upon Wells and preventing him from seeking redress in the premises.   The case attempted to be made was not a new one arising upon new facts, but one involving matters which the court was, or might have been, called upon to determine.   And if, as asserted by his counsel, appellant's "remedy grows out of the fraud, his right arises out of the errors committed to his prejudice," then the remedy ought to have been sought in the court which rendered the decree and confirmed the sale.   This, if there were error in respect of the certificates and the release, (which forms the basis of plaintiff's claim;) but if none were committed, then relief through the enforcement of a lien upon eight thousand acres, and adjudging the same or the profits therefrom to be held in trust for Wells, or through a money decree in lieu thereof, could not be awarded.

Nor do we think that plaintiff has any better standing by reason of the allegation that the Circuit Court for the Eastern District of Michigan had no jurisdiction of the Sutherland suit, because Sutherland was not a citizen of New Jersey, but was a citizen of the same State as Birdseye. This defence was interposed by Birdseye, in his answer, and was determined against him. That determination cannot be questioned here. Moreover, to the consolidated suit, Wells was himself a party as were the trustees named in the various trust deeds, and all were bound by the decree and the subsequent proceedings thereunder.

Suggestion is made in argument that plaintiff was entitled, under the prayer for general relief, to invoke the aid of the court to let him in to share in the benefits of defendants' purchase, but it is sufficient to say that such relief would not be conformable to the case made by the bill.

The demurrers were properly sustained, and the decree is

*Affirmed.*