## Case No. 17,753.

### WILLIAMSON v. NEW ALBANY, ETC., R. CO.

[1 Biss. 198; 2 Redf. Am. Ry. Cas. 682.] [1]

Circuit Court, D. Indiana. Oct. 26, 1857.

APPOINTMENT OF RECEIVER—TRUSTEE UNDER RAILROAD MORTGAGE—DUTIES—DEFAULT IN INTEREST—APPLICATION OF INCOME.

1. The appointment of a receiver of the property of a railroad company in the foreclosure of a mortgage, is not a matter of course, on default

[3] [From 13 N. B. R. 319.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 2 Redf. Am. Ry. Cas. 682, contains only a partial report.]

of payment of interest, but is a matter resting in the sound discretion of the court.

[Followed in Union Trust Co. v. Railroad Co., Case No. 14,402; Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., 53 Fed. 196, note; M'George v. Big Stone Gap Imp. Co., 57 Fed. 270.]

2. A railroad corporation had given a deed of trust of all its property present and to be acquired, to secure certain bonds, which were negotiated. By the provisions of this deed, the trustee, on default of payment of either principal or interest of said bonds, or any part thereof, might take possession of said property, or, on the written request of the holders of at least one-half of the then unpaid bonds, might sell the same at public auction. Default was made in the payment of interest, but the trustee did not exercise his powers in the deed. The company issued their bonds and made their mortgages upon its property, and became indebted upon current expenses. The proceeds of the sales of the bonds having become insufficient to complete and operate the road, the president, on consultation with a large number of the bondholders, and by their advice, made other loans and applied the earnings in completing and operating the road, and meeting the most pressing claims. No mismanagement was shown. *Held*: Such an application of the income of the road was not a misapplication of the funds, but on the contrary greatly to the security of the bondholders.

3. Although the trustee might have taken possession of the property, or have sold under the powers in his deed, he may waive this right and file a bill to foreclose.

4. The court of equity, its jurisdiction being thus invoked, will look into the facts and exercise an equitable discretion; it will not enforce the strict penalties of the deed.

[Cited in Cline v. Libby, 46 Wis. 129, 49 N. W. 833.]

5. The action of the officers of the company with the consent of the trustee and part of the bondholders in the expenditure of its income, will be respected and sustained so far at least as to relieve the company from any penalty or charge of misapplication of the funds of the road.

6. Under the circumstances of this case, ordered, that the officers of the company set aside one-half of the net earnings of the road for the payment of the interest on the bonded debt; the other half for the payment of the floating debt, and a full monthly report be made to the court,—the complainant having the right to renew his application for the appointment of a receiver upon a new statement of facts.

[Cited in Pullan v. Cincinnati & C. R. R. Co., Case No. 11,461.]

In equity. In his bill, the plaintiff states that the defendant owns, and has in operation, a line of railroad, commencing at New Albany, on the Ohio river, extending thence to Michigan City, on Lake Michigan, two hundred and eighty-eight miles; also a branch of said road, not yet in operation, extending from Gosport, in Owen county, to Indianapolis, of the length of forty-three miles; that in connection with the road and branch, the company has in use a large amount of rolling stock, consisting of locomotive engines and cars of various descriptions; also various machine-shops for making and repairing engines, cars and machinery; also various other property necessary to equip said road for a successful operation, in the transportation of passengers and freights; with corporate powers to regulate the same, charge freight and passage money; which machinery in its operations is so combined as not to admit of a separation, on which account the complainant prays that the same may be sold or otherwise disposed of as an entirety, and in such manner that all of said corporate franchises may pass and vest in the purchaser or purchasers, as a body corporate.

The complainant further states that the said company, on the eighth day of February, 1851, being engaged in constructing that part of its railroad which lies between New Albany and Gosport, one hundred and twelve and seventy-one one hundredth miles, and being in need of money to build the road and properly equip it, resolved to borrow five hundred thousand dollars, to be secured by certain bonds, of one thousand dollars each, payable semi-annually in the city of New York, at ten per cent. per annum, subject to a clause that the holders thereof should have the right to exchange them at par for stock; that, to secure the payment of said bonds, a deed of trust was executed, which the complainant holds, whereby the company granted, bargained and sold to the complainant and his successors in the trust created, all the following then present, and then in the future to be acquired property of said company, pertaining to that part of the road which lies between New Albany and Gosport, to wit: the road made and to be made, including the right of way, and every description of property which pertained to the road, and which the company might acquire, on the following trusts.

If the company should fail to pay the principal or any part thereof, or the interest or any part thereof on the bonds when the same might become due, when demanded, then, after sixty days from such default, upon request of the holder of such bond, the complainant or his successor in the trust, should enter into and take possession of all and every part of said premises and property, and as the attorney in fact or agent of the company, by himself and agents or substitutes duly constituted, have and employ the same in making all needful repairs, alterations, and additions thereto; and after deducting expenses of such use, repairs, alterations, and additions, apply the proceeds thereof to the payment of the principal and interest of all said bonds remaining unpaid; or the complainant, his successors in said trust, at his or their direction, might on the written request of the holders of at least one-half of the bonds then unpaid and unconverted into stock, cause the same premises, or so much thereof as should be necessary to pay the principal and interest of all the bonds then unpaid, to be sold at public auction in the city of New Albany, in the state of Indiana, or in the city of New York, giving at least forty days notice, &c. The bonds were duly executed, and the money loaned on the faith of the security, &c.

And the complainant says that the company

paid the interest which became due prior to the 1st of February, 1857. That the interest which became due on that day, they failed to pay, and that the whole of the coupons for the installment of interest which fell due on that day are unpaid, amounting to the aggregate sum of twenty-five thousand dollars, more than sixty days after the maturity of said coupons having transpired. After this, the holders of a large number of said bonds required the complainant, as trustee, to enter upon and take possession of said mortgaged premises; and other holders of said bonds, to an amount exceeding one-half thereof, requested the complainant in writing, to proceed according to the terms and conditions of said deed of trust, to make sale of the mortgaged premises. But he deemed it inexpedient so to do.

And the bill states, that several other loans were made of large amounts, at different rates of interest, by issuing and selling bonds, secured by deeds of trust on the property of the road on the same conditions as those specified in the first mortgage. On all of which subsequent loans the interest has become due and remains unpaid. He has not entered upon the property as above requested, to sell the same as authorized by the deeds of trust, because he says the company is much embarrassed in its affairs, being largely insolvent and owing a large floating, unsecured debt. That many of that class of creditors have prosecuted suits and judgments against the company, and are seeking to enforce satisfaction by the seizure and sale of the property on the road, &c.

That by reason of the premises, it is indispensably necessary to sell and dispose of said mortgaged premises, to the end that the proceeds may be applied as contemplated by all the deeds of trust.

All interest due prior to the 1st of February, 1857, has been paid; but that which became due on that date has not been paid, and for this default the bill was filed.

Stanberry, Ketchum & Lane, for complainant.

Smith, Crawford & McDonald, for defendant.

McLEAN, Circuit Justice. It is objected that as the complainant, under the trust deed, has power to take possession of the property, this proceeding in chancery is unnecessary and ought not to be sustained.

If this exercise of power under the deed be admitted, it is not perceived that it may not be waived.

To strengthen the application for a receiver, the affidavits of Mr. Lane, the counsel, and Mr. Williamson, the trustee, are filed, and the last report of the railroad company.

Mr. Lane states, that he lately visited New Albany in Indiana, where the principle office of the company is established, and he found the financial condition of the company exceedingly poor; that the laborers on the road had not been paid their wages for a long time, and that there had been a strike, &c., and he proposed to the company that the laborers should be paid out of the first net earnings; and that the property of the road should be given up to the trustee, &c., but the president of the company rejected the proposal.

The affidavit of the complainant corroborates, in some degree, the facts stated by Mr. Lane, in regard to the embarrassed condition of the company, founded upon the representations made to him; he says that the interest has not been paid, as alleged in the bill; and that the bill is true. And he says that the company, in his opinion, are by no means able to pay the amounts due and to fall due on their various issues of bonds; that the property of the company is jeoparded by a large and constantly increasing floating debt; and that a very large number of those holding bonds of the company, issued under the various mortgages, of which this deponent is trustee, have served on him a written request according to the conditions of the mortgages, requiring him to cause the said road and its various appurtenances to be sold according to the terms of the mortgage. In the deed of trust it was required that at "the written request of the holders of at least one-half of the bonds then unpaid, he shall cause the premises to be sold." The words used in the above affidavit are not equivalent to the requirement of the deed. But the bill alleges, in the words of the deed, that the request was made, by at least one-half of the bond-holders, and the complainant swears to the truth of the bill.

James Brooks, president of the railroad company, filed an affidavit which admits the execution of the mortgages, and the issue of the bonds as stated by the complainant; but he says the proceeds of the sale of the bonds, the stock subscriptions and other means of said company, were insufficient to finish and equip the road for business; and it became necessary to have other means to finish the road, and put it in such condition as would enable the managers to earn the necessary amount of money to pay the principal and interest of its debt.

At that time the railroad securities had got in such bad repute, that it was impossible to borrow on the sale of bonds, except at such a sacrifice as would be ruinous to the company. The company was reduced to the alternative of abandoning the road in an unfinished state, which would have caused an almost total sacrifice to the bond-holders, or to state the difficulty frankly to such of the bondholders as could be seen, and go on and use the net earnings of the road with such other means as the company could command, and finish and equip it.

He further says that he saw a large number of the bond-holders from time to time, in his visits to New York, and with whom he

was in correspondence, who were fully advised of these difficulties; and they uniformly advised him to go on by all means and finish the road, and relay the flat bar track in good order for running, so as to pay the debts of the company. The deponent believes, and the complainant and bond-holders expressed to him the belief that, but for an unlooked for loss, by the failure of the crops of 1854 and 1856, the road could not only have been finished and put in good order, but the floating debt paid off, and the interest paid on the bonds. He denies that there has been the misapplication of a dollar of the funds of the road.

There are some judgments against the road for claims of damages for right of way, where the parties refused to abide by the awards made; but with the exception of this class of claims, there are few, if any, judgments against the company; and there never has been two hundred dollars worth of property of the road sold on execution. The net earnings of the road for the present year have been expended in paying for labor and materials, and in constructing and operating said road, and repayment of money thus expended.

He says and believes, that the road and appurtenances are more than sufficient to pay all of its debts, and that the security in the bonds has been increased nearly fifty per cent. since the first three millions of its bonds were negotiated. The deponent states that many of the bond-holders and others competent to judge, who have examined the work, expressed the opinion that more work had been done, in the construction of this road, than on any other road for the amount of money.

The United States engineers and the engineers of the state of Indiana estimated the cost of this road from New Albany to Crawfordsville, a distance of one hundred and sixty miles, at sixteen millions of dollars, which has been built by the company for less than five millions. And the entire road from New Albany to Michigan City, two hundred and eighty-eight miles, has been constructed for about seven and a half millions of dollars.

The managers of the road felt safe in assuring the laborers on it that they would be paid, as the work was not only done with the knowledge, but at the repeated and urgent request of the complainant, as well as a large number of the bond-holders, with whom deponent from time to time came in contact.

The floating debt of the company on the 1st of October, 1857, was about the sum of $235,000, which shows a reduction of $45,000 since the 1st of July last.

In the year 1855, the net earnings of the road amounted to the sum of $372,402.25. This paid $315,256.59, the interest on bonds, and left a surplus of $56,125.36. The gross earnings of the six months preceding the 1st of January, 1857, amounted to the sum of $413,666.66, which left a balance, after deducting all expenses during the same time, of $190,531.70.

The gross earnings of the road ending June 30, 1857, amounted to the sum of $686,818.72, which, after deducting the expenditure for the same time, left the net earnings $268,090.95; and this, the president of the road says is $200,000 less than the sum estimated, which was caused by the failure of all the great staples of the country in the year 1856, reducing the amount of transportation, as is supposed, to that amount.

The interest now due is about $273,000, which sum, together with the floating debt, and the accruing interest, may be provided for and paid, under prosperous circumstances, in a reasonably short time. After the payment of the floating debt, it is not doubted that the accruing interest will be punctually discharged, if no untoward circumstance should occur.

The case made in the bill is, the failure to pay the interest on the bonds in February last, and the embarrassed condition of the railroad company.

It seems to be considered that a receiver will be appointed, as a matter of course, under the mortgage where a default has occurred in the payment of any part of the interest or principal. If this be so, the chancellor, in such a case, can exercise no discretion. He can do nothing less than carry into effect the conditions of the bond.

It is not the province of chancery to enforce penalties, but to relieve against them. It is asked, may the court disregard the contract of the parties? Certainly not. But where there is a hard and an unconscionable contract, a court of equity will withhold its aid, and leave the party to his remedy at law. An individual promises to pay on a certain day, a thousand dollars, and, in default thereof, to pay two thousand. Would not a court of chancery relieve from this penalty? And the payment of the penalty is the contract of the party. What penalty could be more disproportionate to the default, than the one under consideration? A failure to pay any part of the installment of interest, subjects the company to the immediate payment of several millions of dollars, not payable except under the default for many years; and the same default subjects property to the amount of several millions to a sale at auction, on a short notice.

The appointment of a receiver, when directed, is made for the benefit of all the parties interested, and not for the benefit of the plaintiff, or of one defendant only. 2 Story, Eq. Jur. § 829. It is a matter resting in the sound discretion of the court.

In such cases courts of equity will pay a just respect to such legal and equitable rights and interests of the possessor of the

fund, and will not withdraw it from him by the appointment of a receiver unless the facts averred and established in proof show that there has been an abuse or a danger of abuse on his part. For the rule of such courts is not to displace a bona fide possessor from any of the just rights attached to his title, unless there be some equitable ground for interference. Tyson v. Fairclough, 2 Sim. & S. 142; 2 Story, Eq. Jur. § 835.

It is true the parties in the contract, under consideration, agreed that a default in the payment of any part of the interest or principal, when payable and demanded, should incur the penalty sought to be enforced. Yet, when the aid of a court of equity is invoked it will look into the facts and exercise an equitable discretion. And if the party claims and attempts to exercise the powers given him in the contract, which, under the circumstances, are unjust and ruinous, he may be enjoined.

Has there been any abuse of their powers, or a misapplication of their funds by this company, which authorizes the appointment of a receiver?

This step is to be taken by the bill, with the view of selling the entire road, and all its appurtenances, for the benefit of the bond-holders.

The interest due in February last has not been paid, and since that time another installment of interest has become due, which has not been paid. All previously accruing installments of interest were paid or satisfactorily arranged. And the late large outlay for the completion of the road and its equipment, was not only approved by the complainant and many of the bondholders, but they urged the president of the company to go on with the work by all means, and finish and equip the road, so as to increase the revenue, and they agreed to receive bonds in payment of the interest then due.

Under the influence of this encouragement it seems the company prosecuted the work and completed the road, which is now in successful operation. In this way, as appears from the affidavits, was every dollar of the floating debt, complained of, created. It went to increase the securities of the bond-holders by adding to the value of the road, and increasing the tolls for the payment of the interest and principal. But this is now insisted on as a misapplication of the funds of the road, which not only authorizes, but requires the appointment of a receiver.

But this does not, in my judgment, evince bad faith on the part of the company, but, on the contrary, showed a laudable desire to save the bond-holders and all the parties interested from loss.

Had the road been in the hands of a receiver, no chancellor fit to deal with these subjects, it appears to me, could have hesitated to order the receiver to do, in this respect, what the company has done. In the deed of trust it is specially provided that the trustee, if he take possession of the road, shall make repairs, additions, &c., and an offer is now made to pay this floating debt, so far, at least, as laborers are concerned, if the road be given up by the company. Whether the debt be due to laborers on the road or to others, is not material, seeing it was incurred under the urgent request of the trustee and several of the bond-holders, and for the preservation and life of the road.

When property is purchased and placed upon the road, no lien being taken by the seller, it becomes subject to the mortgage lien on the road, so that it is not liable to an execution, except under the mortgage; and existing liens on the road, under the mortgages, can only be adjusted by a court of equity.

But it is said, the complainant, and a part of the bond-holders, had no power to authorize the new expenditure in the completion of the road. Such an authority as was exercised will be respected and sustained by any chancellor, at least so far as to relieve the company from any penalty or charge of misapplication of the funds of the road.

By what authority does the complainant sue in this case and claim a right to have equities adjusted between parties who claim conflicting interests? But in a matter of this kind, so essential to the interests of the bond-holders, there can be no difficulty in sustaining the company, as above stated. but still the default is admitted, and the failure to pay occurred under the circumstances stated; and the question now is whether this default requires the appointment of a receiver and a discontinuance of the agency which now controls the road; and this is to be done preparatory to the sale of the entire property of the road.

The bonds will not be due and payable for many years. They who made the loans looked to the interest, and the ultimate payment of the principal.

This procedure involves some fourteen or fifteen millions of property; the property of the railroad and of the bondholders. Care should be taken in this case, as in all others, to administer equity, without, if possible, a sacrifice of property.

From the exhibits in this case, there is a reasonable probability that, in the course of a short period, a vigorous operation of this road may enable its directors to pay the deferred interest and their floating debt; and the discharge of these will make the payment of the current interest on its bonds easy, out of the net profits.

If there were no other interests involved than that of the bond-holders, such a course is so strongly recommended by equitable considerations, that no intelligent holder of such securities could object to it. The floating debt has accrued under circumstances which give a strong claim to the company for some indulgence in the payment of the deferred

interest, seeing the completion has added so much value to the security of the bond-holders, and increased the profits of the road; and, especially, as the work was done on the recommendation of the complainant, and a part of the bondholders.

So far as the conduct of the company has been developed in this somewhat informal examination, it is entitled to the highest commendation for its firmness, energy and success, in the accomplishment of this great work.

There is a strong probability that, in a very short time, the road will be in a condition to meet its engagements under the mortgages, which is all the bond creditors have a right to demand.

No change of agency could increase, I am convinced, the efficiency of that already employed on the road. A sale of the property would in all probability, sacrifice the stock of the road amounting to between two and three millions of dollars, and more than half if not two-thirds of the property of the bondholders. It might enable some one or more persons to purchase the road at an almost nominal consideration. These consequences, I admit, are not to stand in the way of an equitable right, enforced under circumstances of fairness and justice. But if such results may be avoided by a short postponement of the interest, and under a prospect of a speedy payment, I hold myself authorized to do so, under the facts above stated.

But I will afford to the bond-holders every reasonable assurance that can be required. I will admit an order to be entered that the motion of the complainant for the appointment of a receiver be denied, and that the said company, from and after the 1st day of January next, set aside one-half of the net earnings of the road, for the payment of the interest of the bonded debt of said company, —the other half to be applied to the payment of the floating debt of the company, a report of the gross and net earnings to be made to the court monthly by the secretary of the company; that is for the month of January, and at the close of the succeeding months, so soon as the returns can be received and made out, half of the net earnings to be paid into court for the bondholders. The company will report, also, in the court how the net earnings have been expended from the 1st of November to the 1st of January aforesaid.

But nothing in this order is to be understood as preventing the plaintiff from renewing his motion for a receiver at any time prior or subsequent to said 1st of January, upon any new statement of facts which he may be able to present.

The interest is payable on demand. If the bringing of the action be considered a sufficient demand, the coupons must be presented and filed, if payable to bearer, before payment will be ordered.