FARMERS' LOAN & TRUST CO. v. KANSAS CITY, W. & N. W. R. CO. et al.

(Circuit Court, D. Kansas. November 21, 1892.)

1. RAILROAD MORTGAGES—FORECLOSURE—APPOINTMENT OF RECEIVERS.
    In the foreclosure of a railroad mortgage the appointment of a receiver is not a matter of right, but rests in the sound discretion of the court, and is a power to be exercised sparingly, and with great caution.

2. SAME—DISCRETION OF COURT—IMPOSING TERMS.
    In appointing a receiver in a railroad foreclosure suit the court may impose such conditions as appear to be just and equitable, and the party asking for and accepting the appointment on such conditions will be bound thereby.

3. SAME—PREFERENTIAL INDEBTEDNESS—DIVERTED EARNINGS.
    In railroad foreclosure proceedings, preferential debts, which may be given priority on the appointment of a receiver, are in general those which have aided to conserve the property, and have been contracted within a reasonable time, and there is no fixed rule barring claims contracted more than six months, before the appointment; nor is the authority to give priority limited to cases in which there has been a diversion of income.

4. SAME—TRUSTEE—POWER TO BIND BONDHOLDERS.
    In a railroad foreclosure suit the trustee named in the mortgage represents the bondholders, and, if he acts in good faith, whatever binds him binds them, although they are not actual parties; and they have no right, therefore, to be made parties to the suit, except where the trustee is not acting in good faith for the protection of their interests.

5. SAME.
    In a suit brought by a trustee to foreclose a railroad mortgage in Kansas it appeared that there were many creditors entitled under the laws of the state to liens on the property, or parts of it, and also other creditors who had the right to subject the income and earnings of the road to the payment of their claims. As a condition of appointing a receiver, the court required the trustee to assent to the payment of all these claims prior to the satisfaction of the bonds, and accordingly the decree of appointment provided for the payment of all debts for ticket and freight balances, for work, labor, materials, machinery, fixtures, and supplies of every kind and character furnished in the construction, extension, repair, equipment, or operation of the road, and all liabilities incurred in the transportation of freight and passengers, including damage to person and property, which had accrued since the execution of the mortgage, (January 2, 1888.) *Held* that this was a proper exercise of the court's discretion to impose terms, and that the trustee's assent thereto was binding upon the bondholders, and the latter would not be permitted to become parties to the suit for the purpose of having this decree vacated.[1]

In Equity. Bill by the Farmers' Loan & Trust Company against the Kansas City, Wyandotte & Northwestern Railroad Company to-

[1]See note at end of case.

foreclose a mortgage. On complainant's application, a receiver was appointed on condition that priority should be given to certain described claims, to which condition the complainant assented. Certain of the bondholders were thereafter, on their own application, allowed to become parties defendant, and they now move to strike from the decree the part awarding priority to such claims. At the same time a motion is made to vacate the order making such bondholders parties. The former motion denied, and the latter granted.

Turner, McClure & Rolston and Rossington, Smith & Dallas, for complainant.

Wheeler H. Peckham, for intervener.

M. Summerfield, for defendant and receiver.

CALDWELL, Circuit Judge. On the 2d day of January, 1888, the Kansas City, Wyandotte & Northwestern Railroad Company executed a mortgage on its railroad and appurtenant property to the Farmers' Loan & Trust Company, of New York, as trustee, to secure the payment of a series of bonds issued by the railroad company, amounting to $3,750,000. On the 21st day of March, 1890, the trustee named in the mortgage filed in this court its bill to foreclose the mortgage. The bill, among other things, alleged that the company was insolvent, and had made default in the payment of the interest coupons, and that the plaintiff had been requested by the holders of the requisite amount of bonds to bring suit to foreclose the mortgage. The bill prayed for the appointment of a receiver. When the motion for receiver was brought on for hearing it appeared that the road had been recently constructed, was probably not then fully completed and equipped, and that the company owed some debts for work done, and for labor, materials, machinery, and supplies furnished, in the construction, extension, equipment, and operation of the road and its branches. These debts, it appeared, were contracted after the execution of the mortgage, and most of them accrued or matured not many months before the filing of the bill. They were contracted to create or conserve the mortgaged property, and were extremely meritorious. The bill alleged, in terms, "that the defendants are financially embarrassed, and that they owe a large amount of floating and unsecured debts for labor, material, and supplies, which they are unable to pay:" and "that certain of the creditors of the said defendants, to whom they are indebted for labor and material employed and used in the construction of said roads, are threatening to, and your orator believes will, file liens thereon upon the property of said defendants, and to cause attachments to be issued and levied upon the same, which, if done, will embarrass the operation of said roads, diminish their earnings and income, and impair the value of the property conveyed by said mortgage to your orator, and endanger the security thereunder to the holders of said bonds."

It was apparent that these creditors, by proceeding under the local law, in the state courts, could secure and collect all or a portion of their debts. It appeared that some of these creditors were entitled

to liens on the property, or parts of it, and all of them had the right to subject the income and earnings of the road to the payment of their debts by a proper proceeding for that purpose; for, while the mortgage may in terms give a lien upon the income and earnings of the road, it is well settled that, until the mortgagee takes possession, or a receiver is appointed, the income and earnings belong to the company, and any judgment creditor may subject the same to the payment of his judgment. Bridge Co. v. Heidelbach, 94 U. S. 798; Fosdick v. Schall, 99 U. S. 235, 253; Dow v. Railroad Co., 124 U. S. 652, 8 Sup. Ct. Rep. 673; Sage v. Railroad Co., 125 U. S. 361, 8 Sup. Ct. Rep. 887. Under the circumstances of the case, it was obvious that it would be extremely unjust and inequitable for the court to deprive these creditors, whose labor and materials had contributed to the creation and preservation of the mortgaged property, of their right to establish their liens and collect their debts without making some just provision for the ultimate payment of the same. The court therefore required as a condition of the appointment of a receiver that the plaintiff should consent upon the record that these debts should be declared to be a prior lien on the mortgaged property, and paid out of the proceeds of the foreclosure sale, if not sooner paid out of the earnings of the road. Profiting by its experience in previous cases, the court declined to act upon the assent of counsel appearing for the plaintiff, until the plaintiff had been advised of the condition which the court proposed to impose, and expressly instructed its counsel to assent thereto. After being advised of its terms, the plaintiff instructed its counsel to assent to the condition, and the court thereupon appointed a receiver, the order of appointment containing the following conditions:

"The foregoing order appointing a receiver in this cause is made upon this express condition: That the said plaintiff, as trustee and mortgagee representing the mortgage bondholders whose debts are secured by the said mortgage, consents and agrees that the debts due from the railroad company for ticket and freight balances, and for work, labor, materials, machinery, fixtures, and supplies of every kind and character, done, performed or furnished in the construction, extension, repair, equipment, or operation of said road and its branches in the state of Kansas, and liabilities incurred by said company in the transportation of freight and passengers, including damage to person and property, which have accrued since the execution of the mortgage set out in the bill of complaint, being the 2d day of January, 1888, together with all debts and liabilities which the said receiver may incur in operating said road, including claims for injury to person and property, shall constitute a lien on said railroad and all property appurtenant thereto superior and paramount to the lien of the mortgage set out in the bill, and said railroad shall not be released or discharged from said lien until said debts and liabilities are paid. The receiver is authorized and directed to pay all such debts and liabilities out of the earnings of the road or out of any funds in his hands applicable to that purpose, and, if not sooner discharged, then the same shall be paid out of the proceeds of the sale of the road."

Among the well-settled rules applicable to the appointment of a receiver in a suit for the foreclosure of a mortgage on a railroad are the following:

1. That the appointment of such a receiver is not a matter of right, but rests in the sound discretion of the court, and is a power

to be exercised sparingly, and with great caution. Railroad Co. v. Howard, 131 U. S. Append. lxxxi; Fosdick v. Schall, 99 U. S. 235, 253; Sage v. Railroad Co., 125 U. S. 361, 376, 8 Sup. Ct. Rep. 887.

2. That the court appointing a receiver may impose such conditions as appear to be just and equitable, and the party asking for and accepting the appointment of a receiver on the conditions imposed will be bound thereby. In Fosdick v. Schall, supra, Chief Justice Waite, speaking for the court, said:

"The mortgagee has his strict rights, which he may enforce in the ordinary way. If he asks no favors, he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers, and grant him purely equitable relief, he may, with propriety, be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity. The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion, and the chancellor should so mold his order that, while favoring one, injustice is not done to another."

And see Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. Rep. 295.

3. The trustee in a railroad mortgage represents the bondholders in all legal proceedings carried on by it to enforce the trust. The bondholders claiming under the mortgage have no interest in the security except that which the trustee holds and represents, and, if the trustee acts in good faith, whatever binds it in any legal proceedings it begins and carries on to enforce the trust, to which they are not actual parties, binds them. Kerrison v. Stewart, 93 U. S. 155; Corcoran v. Canal Co., 94 U. S. 741, 745; Shaw v. Railroad Co., 100 U. S. 605, 611; Richter v. Jerome, 123 U. S. 233, 8 Sup. Ct. Rep. 106. In the case last cited the court say: "Whatever forecloses the trustee, in the absence of fraud or bad faith, forecloses them. This is the undoubted rule." And where the trustee in good faith assents to terms imposed by the court as a condition for appointing a receiver, the bondholders are bound by such assent as fully and absolutely as if it had been given by them in person. In Kneeland v. Luce, 141 U. S. 491, 509, 12 Sup. Ct. Rep. 32, the trustees consented that receiver's certificates might be issued, and made a prior lien on the mortgaged property. Afterwards the bondholders denied the right of the trustees to give such consent, and contested the validity of the receiver's certificates and the priority of lien given them, and the supreme court said: "The consent of the trustees to the issue of the certificates bound every bondholder. There is nothing to show that the trustees acted corruptly or fraudulently." And see, to the same effect, Kent v. Iron Co., 144 U. S. 75, 12 Sup. Ct. Rep. 650. In the case of Elwell v. Fosdick, 134 U. S. 500, 512, 10 Sup. Ct. Rep. 598, the trustees executed a release of errors, and, their authority to do so being questioned by the bondholders, the supreme court said: "The trustee represented the bondholders, not only in the proceeding which resulted in the entry of the decree so that the bondholders were not necessary parties, but he also bound them by his release of errors."

Some time after the appointment of the receiver, August Wolff, claiming to be the holder of some of the stock and mortgage bonds of the company, filed a petition asking to be made a defendant in the suit, and the prayer of his petition was granted by the district judge.

Wolff filed no answer or other pleading in the cause, and subsequently withdrew his appearance in the case, and the order permitting him to intervene as a defendant has been vacated, and his petition dismissed. On the 1st of September, 1890, Andrew Haes and four others, claiming to be holders and bearers of 1,119 of the mortgage bonds, filed their petition to be made defendants in the suit, and the prayer of their petition was granted by the district judge, and they afterwards filed an answer in the suit, and a motion to strike out of the order appointing the receiver that portion relating to the payment of certain debts of the defendant company. A motion was filed on the 19th of December, 1890, to vacate the order allowing said Haes and others to intervene as defendants. This motion has been continued from time to time, and will now be disposed of, together with the motion to vacate that portion of the order appointing the receiver relating to the payment of certain debts of the company.

These bondholders do not allege that the trustee acted fraudulently or in bad faith in agreeing to the conditions upon which the receiver was appointed, or that the trustee has in any manner failed or neglected to discharge its trust intelligently and in good faith. No reason whatever is shown why these bondholders should be permitted to become parties on the record either as plaintiffs or defendants. If bondholders could become parties for the asking, we should have as many parties to these suits as there are bondholders, and the court would be compelled to listen in turn to the views of every bondholder on every question arising in the case. This is wholly inadmissible. Unless fraud or bad faith is alleged against the trustee, the individual bondholders will not be permitted to intervene, and will not be heard to complain of any action of the court based upon the consent of the trustee acting in good faith. In a cause decided by Mr. Justice Bradley on the circuit (Forbes v. Railroad Co., 2 Woods, 323, 335) he said:

"And it is in the discretion of the court whether or not to permit a stockholder to become a party defendant in any cause where he is not made such by the bill. And, as it is held to be an extreme remedy, to be admitted by the court with hesitation and caution, I think I ought not to have allowed it in this case, and ought now to vacate the order for such allowance. 'Generally speaking,' says Calvert, 'a stranger can take no part at all, and cannot even be heard by counsel in a claim of interest in the suit except by consent of parties.' Calv. Parties, 58."

The order granting these bondholders leave to become parties was improvidently made, and will be vacated, and their petition dismissed. The trustee is quite as capable of defending the estate against any unfounded claim as these bondholders, and it is apparent that it is acting in good faith in that regard. The contrary is not alleged. When any unfounded or fraudulent claim shall be presented, and the trustee shall fail to make a proper defense thereto, or whenever it fails in any other respect to discharge its trust honestly and faithfully, it will be time to consider the question of making the bondholders parties for their own protection. It is obvious the real purpose of these persons in having themselves made defendants was to attack that portion of the order of the court appointing the receiver relating to the payment of debts. This condition was imposed after full consideration by the court, upon its own motion, and assented to by the trus-

tee.  If that assent had not been given, the receiver would not have been appointed.  It was clear to the court then, as it is now, that the condition imposed was equitable and just, and in the interest of all parties.  If the creditors whose debts are preferred by the order had been permitted to proceed to enforce their liens and collect their debts at law, the trust estate would have suffered losses much in excess of the debts which are made a charge upon it by the order appointing the receiver; and the trustee acted wisely and in the interest of the bondholders in assenting to the appointment of the receiver on the conditions imposed by the court.  The court declined to appoint the receiver upon any other terms.

Preferential debts, it is commonly said, are those which have aided to conserve the property, and have been contracted within some reasonable period.  But just what debts aid to conserve the property, and what length of time will bar them, is not very clear upon the authorities, and depends largely upon the circumstances of each particular case.  There is no fixed rule barring preferential debts contracted more than six months before the appointment of the receiver.  There is no "six months' rule."  In the case of Hale v. Frost, 99 U. S. 389, the supreme court gave priority to a claim for materials furnished 3 years before the appointment of the receiver, and for which a note had been given 16 months before the receiver was appointed.  In the case of Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. Rep. 675, the court gave priority to a claim for coal supplied 11 months before the appointment of a receiver.  There are cases in the state courts also where priority has been given to debts contracted much more than 6 months before the appointment of the receiver.  See note to Blair v. Railway Co., 22 Fed. Rep. 471, 475.  In the case of Central Trust Co. v. St. Louis, A. & T. Ry. Co., 41 Fed. Rep. 551, the mortgages in suit were executed in 1886 and 1887, and the receiver was appointed in 1889 by Mr. Justice Brewer, then circuit judge; and afterwards, when the question arose as to what debts should have priority, Justice Brewer said:

"I do not understand from the parties making the application for the receiver that there was any desire or thought of cutting off any just claims accruing during the brief period which has elapsed since their mortgage was given, and, if counsel or party had any such idea, they much mistake my judgment in the premises."

The period that elapsed between the giving of the mortgage and the appointment of the receiver in that case was the same that it is in this.

In the case of Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 30 Fed. Rep. 332, 334, the same learned judge said:

"As a single corporation, it was also in debt to an amount exceeding $3,000,000 of floating indebtedness, and yet of that character of indebtedness which, by the decision of the supreme court, was preferred to all mortgages. Thus the preferential debts of three millions and over were a prior lien upon all the roads belonging to the Wabash; not a lien upon one division, and no lien upon another, but a lien upon each and all of them, prior in right to every mortgage, general or local, junior or senior."

This was probably the largest amount of preferential debts ever allowed in a single railroad foreclosure.  It is worthy of note that the

original bill in that case was filed by the mortgagor, viz., the Wabash, St. Louis & Pacific Railway Company, and the receiver was appointed, and the order for the payment of preferential debts made, upon its petition, and not upon a bill filed by the mortgagees or trustees of the bondholders. The bill alleged the inability of the company to pay its debts, and prayed for the appointment of a receiver of its property, and contained this allegation:

"That your orator also issued, within the last two years, its promissory notes for very large sums of money, and, in order to provide means for the meeting of its expenses and the keeping of its road in successful operation, and completing its lines as aforesaid, orator induced a number of persons of high financial standing to become indorsers of said notes; and by means of a credit given by such indorsements orator was enabled to negotiate said notes for value, and received the proceeds thereof; and orator shows unto your honors that there will be due on said promissory notes at maturity about the sum of two millions two hundred thousand dollars. Orator further shows unto your honors that the several persons aforesaid by whom orator's notes were indorsed as aforesaid are partially secured with respect thereto by a pledge of bonds secured by said collateral trust to the nominal amount set forth in Exhibit A, aforesaid, and to that extent said persons have a lien upon all the property embraced in said collateral trust, including the bonds, stocks, rolling stock, engines, and real estate specified in said collateral trust. Orator would further show that the moneys derived from the promissory notes as aforesaid, indorsed as aforesaid, were applied to the payment of interest accruing on bonds secured by the mortgages aforesaid, prior and superior to the bonds secured by the general mortgage aforesaid, and also to the payment of maturing installments of the purchase money of rolling stock necessary and indispensable to the use of orator's road, which payment was necessary in order to prevent the forfeiture of orator's interest in said rolling stock, and its right to the use and possession thereof. And orator would further show that the said collateral trust which said indorsers have a right to rely upon as indemnity to them embraces a large amount of valuable rolling stock necessary to the operation of orator's lines of road, and it also embraces very valuable terminal facilities in the city of Chicago, and in the other cities aforesaid, by means of which orator is enabled to transact the important business in said cities, and without which orator would be unable to maintain its growing trade in said cities."

Upon this showing the court made the following order:

"It is ordered that the receivers herein shall protect, by their obligation as receivers, the promissory notes of complainant corporation falling due May 31, 1884, amounting, in the aggregate, to the sum of $223,333, which notes are secured by the individual indorsements, and the collateral trust bonds referred to in the original bill of complaint and in the petition filed herein May 30, 1884; also the promissory notes of complainant corporation falling due June 4. 1884, secured as aforesaid, and amounting in the aggregate to the sum of $85,000; also all other like promissory notes of complainant corporation secured by indorsements and bonds as aforesaid, which may mature before any other or different order of the court in this behalf shall be made."

It will be observed that this order was made upon the application of the insolvent mortgagor, and without the assent of its mortgagees, and that it covered debts for borrowed money, which accrued "within the last two years." These were a part of the debts, which, in the language of the opinion last cited, were, by the order of the court, made "prior in right to every mortgage, general or local, junior or senior." The mortgagor borrowed money "for the meeting of its expenses, and the keeping of its road in successful operation, and completing its lines," and executed its notes therefor, which were in-

dorsed by persons of high financial standing, and these notes were held to be preferential debts. If a debt for money borrowed by the mortgagor within two years, for the purposes named, is a preferential debt, it is not perceived why the debts due to the persons who furnished the labor, materials, and supplies for these very purposes are not entitled to a like preference. It cannot be maintained that a debt due for materials, labor, and supplies is not a preferred debt so long as it is due to the person who furnished the labor, materials, and supplies, but that a note given for borrowed money to pay such debt at once becomes a preferred debt for the protection of the indorsers. The equity of the indorser cannot be greater than that of the creditor who furnished the materials.

And it is an error to suppose that such debts can only be given priority where there has been a diversion of the income of the road; nor is it true that they can only be paid out of the earnings of the road, and cannot be made a charge on the corpus of the property. A diversion of the income is not essential to give them priority, and they may be made a charge on the corpus of the estate if the earnings are not sufficient to pay them. Miltenberger v. Railway Co., 106 U. S. 286, 311, 312, 1 Sup. Ct. Rep. 140; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 457, 463, 6 Sup. Ct. Rep. 809; Thomas v. Railway Co., 36 Fed. Rep. 808. Nor is it essential that the order for the payment of preferential debts should be made at the time, and as a condition, of appointing a receiver. The better practice is to do so, but, if such an order is not then made, it may be made afterwards. Central Trust Co. v. St. Louis, A. & T. Ry. Co., 41 Fed. Rep. 551; Fosdick v. Schall, supra; Blair v. Railroad Co., 22 Fed. Rep. 471. It is not to be implied from what is here said that a mortgagee of a railroad can escape the payment of preferential debts by a foreclosure of his mortgage without asking for a receiver. Liabilities of a railroad company which fall within the definition of preferential debts have priority over a mortgage on its road, without regard to the question of receivership.

The order appointing the receiver in this case, by its terms, probably included some demands not in the category of preferential debts, as that term is usually construed. Some very nice distinctions have been taken between preferential and nonpreferential debts under the general rule, and the order was designedly made comprehensive enough to silence contention on that subject. As respects the character of the claims to be preferred, it is the same as the order of the court in the case of Dow v. Railway Co., 20 Fed. Rep. 260, 266, and the order made in that case was held by Mr. Justice Brewer, then circuit judge, not to be "in excess of the proper powers and discretion of a court appointing a receiver." Central Trust Co. of New York v. Texas & St. L. Ry. Co., 22 Fed. Rep. 135. It is believed no claim has been allowed as a preferential debt which is not such under the general rule on the subject; but, if the fact is otherwise, no one can complain, so long as the debts allowed come within the terms of the order. It is due to the trustee to say that it has not at any time shown the slightest disposition to break its faith with the creditors or the court in this matter, but, on the contrary, has at all times exhibited that high sense of business integrity and honor

which should always characterize those engaged in the management and execution of large financial trusts.

It is undoubtedly true that at common law the first lien acquired by contract or by operation of law has precedence, but that rule never had any application in the maritime law, and equity has largely modified it in its application to suits to foreclose railroad mortgages. By the maritime law, speaking generally, seamen's wages held the first rank, a bottomry bond next, the claims of material men next, and claims for damages to person and property are preferred to the lien of a mortgage, which holds the lowest rank. The ground upon which these rules proceed is that of giving preference to those last aiding to conserve the property. In Railroad Co. v. Cowdrey, 11 Wall. 459, the supreme court said the rule referred to "has never been introduced into our laws except in maritime cases;" and this was undoubtedly true; but that court, in numerous later cases for the foreclosure of railroad mortgages, has recognized the justice and necessity of modifying the common-law rule as to the priority of liens, and adopted to a limited extent, as applicable to suits for the foreclosure of railroad mortgages, some of the principles of the maritime law. This was first done in Fosdick v. Schall, supra, and that case has been followed, and its doctrine applied, in numerous later cases.

Railroads and railroad mortgages are of modern origin. The courts at first failed to distinguish between a mortgage on a railroad and a mortgage on a house and lot, and receivers were appointed without making any provision to pay even the current wages of the employes of the company, or to pay for the most essential supplies, however recently furnished. Experience and observation demonstrated the inequity of this mode of proceeding. Courts of equity were compelled to inquire into the nature of railroad property and railroad mortgages. It was perceived that, as a security for a debt, there was much more analogy between a railroad and a ship than there was between a railroad and a house and lot. It was perceived that railroads performed on land the same offices that ships did on the sea. They are both great and indispensable instruments of commerce. Their chief difference as such instruments is the chemical composition of the elements upon which they are operated. One moves in the water and the other on iron rails. It is said of ships that they are made to plow the seas, and not to rot at the wharfs, and railroads are built to be actually operated in carrying the commerce of the country, and not to rust out. Unless it is kept in operation, a railroad does not fulfill the purpose of its creation, and is comparatively valueless as a mortgage security; but, like a ship, it cannot be operated and made valuable as an instrument of commerce, or for any other purpose, without incurring daily expenses for work, supplies, and materials. These debts are never paid at the time they are contracted. That is impossible from the nature of the business. In the case of solvent companies, the time of payment varies, and it varies with the same company at different times. It is longer or shorter, depending on the financial condition of the company, the length of its line, and other causes. The labor, supplies, and materials are absolutely essential to the operation of the

road, and, as a matter of fact, are in most cases furnished on its credit, in the same sense that the supplies of a ship are furnished on the credit of the ship. For these and other like reasons there has been a growing tendency among the courts and legislatures in this country to give such debts of a railroad company priority over the lien of a mortgage. It seems probable that the courts will not have to deal with the question, on general principles of equity, much longer. Some of the states have already passed acts giving all obligations incurred in the construction and operation of a railroad priority over mortgages, and similar statutes will probably soon be passed in other states, unless the practice and decisions of their courts shall render them unnecessary. Undoubtedly, under the operation of these statutes, and the later and sounder practice of courts of equity, acting independently of any statute, in requiring as a condition of the appointment of a receiver for a railroad the payment of the class of debts mentioned, the ends of justice have been promoted, and a stop put to some practices which were extremely inequitable and injurious alike to the company, the mortgagee, and the general creditors. It occurs less frequently now than formerly, that railroad receivers are appointed and mortgages foreclosed leaving unpaid in whole or in part those whose labor and materials built the road and created the security,—for railroad mortgages are sometimes executed before a shovelful of earth has been thrown towards the construction of the road,—or kept it in repair and operation after its construction. When it is known that a misapplication or fraudulent use of the proceeds of the bonds or the earnings of the road cannot be visited upon the innocent persons whose labor and materials build the road or keep it in repair and operation, the mortgagee will see to it that the revenues of the company, derived from these and all other sources, are expended for legitimate purposes. Honesty and economy in railroad building and management will thus be promoted, and the company, the mortgagee, and the public will alike be benefited.

In this case the court enjoined the creditors from proceeding to collect their debts by the customary methods. In compliance with the order of the court, the creditors have presented their claims, and they have been allowed, and proper certificates of indebtedness issued, which have in most cases been assigned to persons who purchased them in good faith, relying upon the order of the court. The creditors and the public had a right to rely upon the court's order. Kneeland v. Luce, 141 U. S. 491, 509, 12 Sup. Ct. Rep. 32. Courts should keep faith with suitors and the public if no one else does. If the question of the obligation of contracts is to be considered, it would seem that the agreement of the trustee with the court, and, through the court, with these creditors, constituted a contract of the very highest obligation. This obligation, so far as it relates to the court, is heightened by the consideration that for a breach thereof on the part of the court the law affords the citizen no redress. The court cannot be made to respond for a breach of its engagements.

Only honest and bona fide debts of the character named in the order will be allowed and made a charge upon the estate. As stated

before, no claim has thus far been allowed which would not be a preferential debt by the strictest rule on that subject, and none will be allowed which do not fall clearly within the provisions of the order. The motion to vacate the order of the court relating to the payment of debts is denied.

## NOTE.

RAILROAD MORTGAGES—FORECLOSURE—RECEIVERS—PREFERENTIAL INDEBTEDNESS.

The opinion in the principal case contains the first vigorous protest against the disposition to put railroads upon the same plane as other species of property with reference to the effect of mortgages upon the rights of third persons; and, while the case does not turn upon this reasoning, it demonstrates the fact that, if the law of precedent were now as elastic as in the days when the maritime law of liens was created, railroads ought especially to be subjected to similar doctrines. The analogies drawn by the learned judge who delivered the opinion are rendered more forcible when, in connection with the commercial policy outlined by him, it is borne in mind that the home port of many railroad corporations, to which employes and material men are expected to look, is a port only in name, representing no more than a favorable field for obtaining the least onerous of corporate charters. In the case of U. S. v. Southern Pac. R. Co., 49 Fed. Rep. 298, it appears from the opinion of Mr. Justice Harlan that the Southern Pacific Company was a corporation of Kentucky, but that it had no property or business in that state, nor any office or agent there, except an assistant clerk, holding a subordinate position, and maintained for the purpose of preserving the charter of that company under the laws of that commonwealth. Its property was all in other states and territories, and its general offices were, and for many years had been, in San Francisco, Cal., and its principal executive officers resided there. This corporation was neither a citizen nor resident of any one of the states or territories in which its road was operated. The same may be said of the Choctaw Coal & Railroad Company, a railroad corporation incorporated in Minnesota, all of whose property and offices were in the Indian Territory or Pennsylvania. See Insurance Co. v. Cooper, 4 U. S. App. 631, 633, 2 C. C. A. 245, 51 Fed. Rep. 332. It "must dwell in the place of its creation," (Bank v. Earle, 13 Pet. 588,) and cannot be sued in a federal court where its road is operated by a citizen of another state. Here the home port was a mere sham. And the deluded employe or material man would have found it impracticable to reach anything there, although he was compelled, in order to get a judgment in the federal courts, to go to the state by whose laws it was created—to the home port—to sue the corporation. Shaw v. Mining Co., 145 U. S. 444, 12 Sup. Ct. Rep. 935, overruling the decision in U. S. v. Southern Pac. R. Co., 49 Fed. Rep. 297. See, also, Pendleton v. Russell, 144 U. S. 640, 12 Sup. Ct. Rep. 743. All that could have been in contemplation upon the part of those whose bone and sinew and means kept it a going concern was the property of the company at the place of its location.

Another reason for holding to a view such as that now under discussion is the fact that railroad companies have been treated as exceptional public bodies, who, unlike private enterprises, were entitled to the exercise of the sovereign prerogative of eminent domain, and who, because of their unique character, were entitled to be totally relieved from the doctrines of trespass to real estate, which, in the case of individuals and governmental bodies, gave to the true owner the improvements of a bona fide, but illegal, possessor. Justice v. Railroad Co., 87 Pa. St. 28; Jones v. Railroad Co., 70 Ala. 227; Navigation Co. v. Mosier, 14 Or. 519, 13 Pac. Rep. 300; Newgass v. Railroad Co., 54 Ark. 140, 146, 15 S. W. Rep. 188; Railroad Co. v. Dickson, 63 Miss. 380; State v. Baker, 20 Fla. 616; Cohen v. Railroad Co., 34 Kan. 158, 8 S. W. Rep. 138; Railway Co. v. Dunlap, 47 Mich. 456, 11 N. W. Rep. 271; Railway Co. v. Goodwin, 111 Ill. 273; Searl v. School District, 133 U. S. 553, 10 Sup. Ct. Rep. 374; Lyon v. Railroad Co., 42 Wis. 538,—with which compare U. S. v. A Certain Tract of Land, 47 Cal. 515; Meigs v. McClung's Lessee, 9 Cranch, 11, 18; Price v. Ferry Co., 31 N. J. Eq. 31; Wilcox v. Jackson, 13 Pet. 498; Graham v. Railroad Co.,

36 Ind. 463; U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. Rep. 240; Hunt v. Iron Co., 97 Mass. 279; Railroad Co. v. Robbins, 35 Ohio St. 531.

Railroads are also essentially unique, in this: that while they require a right of way, rails, stations, machine shops, etc., these are but adjuncts to the running of cars. In its last analysis a railroad consists of trains of cars moving from station to station, from state to state, and, in some instances, from ocean to ocean. It is the operation of these trains which keeps the railroad a going concern,—an operation which, more than ships, requires services and employes. Dow v. Railroad Co., 20 Fed. Rep. 264. One cannot refrain from thinking, in view of these reflections, that the supreme court of the United States took too narrow a view (a view they have since not rigorously adhered to) when they refused to assimilate the claim for supplies of the material man furnished to a railroad to the lien of the material man in admiralty, as against a mortgagee. Railroad Co. v. Cowdrey, 11 Wall. 459, 482. But the flexibility of the law does not now seem to be equal to the task of stating and enforcing so equitable a rule, on these grounds, without the aid of legislation.

In many of the states of the Union the legislatures have taken up the matter more or less extensively. In California, Colorado, Connecticut, Dakota, Georgia, Idaho, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Mexico, Rhode Island, and Tennessee, the laws, in diverse ways, protect the laborer and material man who furnish labor and material in the construction of a railroad. In Maine, Mississippi, North Carolina, Vermont, and Wisconsin the lien law seems only to reach the laborer who expends labor in the construction of the road. In Utah and Washington the law protects the laborer and material man who furnish labor or material in construction, equipment, or repairs, etc. In Alabama, Florida, and New Jersey the laborer and employe who expend labor and services in operating the road seem to be protected. In New York the laborer who expends work in the operation of the road seems to be protected. In Ohio, Pennsylvania, and Texas the law seems to cover labor expended in construction and operation of the road. In Arizona, Illinois, Indiana, and Virginia the mechanic, laborer, operative, and material man all seem to be protected, as well for work or material in operating as constructing the road. In Iowa the law does not seem to reach the employe, but otherwise is more comprehensive than the states last stated. It goes further in protecting with a lien parties who sustain injuries, and in making the lien of the lien creditor paramount to existing mortgages. Kentucky covers all the ground covered by the law in Arizona, Illinois, Indiana, or Virginia. The law of Arkansas seems to be the most comprehensive and simple of all. Under its provisions the mechanic, laborer, employe, material man, and the party damaged in person or property have a lien paramount to any mortgage, trust deed, lease, or other mode of transfer executed after the act was passed. 2 Jones, Liens, §§ 1634-1673, inclusive.

But, outside of lien laws, many courts have found a way to work out, with more or less dissent, a certain measure of justice to claimants against railroads in preference to the claims of mortgagees. Besides the authorities referred to in the principal case to sustain this contention, the following can be profitably consulted: Douglass v. Cline, 12 Bush, 608; Duncan v. Trustees, etc., (Va.) 9 Amer. Ry. R. 386; Williamson's Adm'r v. Railroad Co., 33 Grat. 624; Poland v. Railroad Co., 52 Vt. 144, 176, 177; Hervey v. Railroad Co., 28 Fed. Rep. 169; Blair v. Railway Co., 22 Fed. Rep. 471; Id., 23 Fed. Rep. 521; United States Trust Co. v. New York, W. S. & B. Ry. Co., 25 Fed. Rep. 797. Mercantile Trust Co. v. Pittsburgh & W. R. Co., 29 Fed. Rep. 732; Atkins v. Railroad Co., 3 Hughes, (U. S.) 307; Railroad Co. v. Johnston, 59 Pa. St. 290,—with which compare Addison v. Lewis, 75 Va. 701; Coe v. Railway Co., 31 N. J. Eq. 105, 130, et seq.; Porter v. Steel Co., 120 U. S. 649, 7 Sup. Ct. Rep. 1206; Fidelity, etc., Co. v. Shenandoah V. R. Co., (Va.) 9 S. E. Rep. 759; Farmers' Loan & Trust Co. v. Chicago, etc., Ry. Co., 42 Fed. Rep. 6; Jessup v. Railroad Co., 3 Woods, 441.

In Fidelity, etc., Co. v. Shenandoah V. R. Co., (Va.) 9 S. E. Rep. 759, 763, it was said, "No invariable rule is deducible from the authorities." In Blair v. Railroad Co., 22 Fed. Rep. 471, the right of claimants as against mortgagees was held not to depend upon a condition to that effect in the appointment of the receiver; and it was also held, Brewer, J., delivering the opinion, that "the idea which underlies claims of this nature is that the management of a large

business like that of a railroad company cannot be conducted on a cash basis. Temporary credit, in the nature of things, is indispensable. Its employes cannot be paid every month. It cannot settle with other roads its traffic balances at the close of every day. Time to adjust and settle these various matters is indispensable. Because, in the nature of things, this is so, such temporary credits must be taken as assented to by the mortgagees, because both the mortgagees and the public are interested in keeping up the road, and having it preserved as a going concern, and whatever is necessary to accomplish this result must be taken as assented to by the mortgagees." In fixing the time prior to the appointment of the receiver that the claim should have been contracted in order to entitle it to enter the charmed circle, it was said in the same case: "There is no arbitrary time prescribed, and it should be only such reasonable time as, in the nature of things, and in the ordinary course of business, would be sufficient to have claims settled and paid. Six months is the longest time I have noticed as yet given. * * * Perhaps, in some large concerns, with extensive lines of road and a complicated business, a longer time might be necessary. " 22 Fed. Rep. 474. In that case only claims accruing six months before the appointment of the receiver were allowed. Claims for car springs and spirals, which existed three years before the appointment of a receiver, as shown in the principal case, have been allowed by the United States supreme court. Hale v. Frost, 99 U. S. 389. In Atkins v. Railroad Co., 3 Hughes, (U. S.) 307, the claim was 22 months old at the time of the appointment of the receiver. For other periods, see note, 22 Fed. Rep. 478. And the supreme court of the United States has not departed from its position in Hale v. Frost, supra, although it has not always been consistent in its utterances. Compare with the cases cited by the learned judge in the principal case, Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 456, 457, 6 Sup. Ct. Rep. 809; Dow v. Railroad Co., 124 U. S. 652, 656, 8 Sup. Ct. Rep. 673; Sage v. Railroad Co., 125 U. S. 361, 8 Sup. Ct. Rep. 887; Union Trust Co. v. Morrison, 125 U. S. 591, 612, 8 Sup. Ct. Rep. 1004; Morgan's, etc., S. S. Co. v. Texas, etc., Ry. Co., 137 U. S. 171, 197, 11 Sup. Ct. Rep. 61; Railroad Co. v. Humphreys, 145 U. S. 82, 103, 12 Sup. Ct. Rep. 787. Various rules are relied upon to sustain the position of the courts, which resolve themselves into an elastic rule, depending upon the breadth of mind of the tribunal determining the matter. The old saying about "the chancellor's foot" seems to be highly appropriate in this connection.

The supreme court of Illinois, in a very recent and a very well considered opinion, has placed the question upon a footing which is highly equitable, and fully sustains the reputation that court enjoys of being a sound exponent of law. Nowhere else is the question placed upon so sound a footing. In the case referred to (Insurance Co. v. Heiss, 31 N. E. Rep. 138) the record disclosed that Heiss and others had instituted their suit in chancery to recover from the Jacksonville Southeastern Railway Company damages which they claimed to have sustained to their property in 1883 by the construction of the railroad through Centralia, Ill.; said claims being evidenced by judgments which they had respectively obtained at law. The company had executed mortgages to secure bonds issued by it on July 1, 1882, upon its property, and any future property it might thereafter acquire. This mortgage was relied upon in the controversy. The mortgage contained the usual provisions for taking possession upon default of payment of interest, etc. The bondholders intervened, set up their rights, and two questions were made, one of which is that now under discussion. The opinion of the court upon that question is as follows:

"It is said that appellants, mortgage bondholders, are innocent purchasers of the bonds, without notice of any equities in appellees; that the mortgage by which the bonds purchased by them are secured is prior both in date of execution and recording to the judgments of appellees and to the accruing of the damages for which the judgments were rendered. It is true, as we have seen, that the mortgage was executed July 1, 1882, and that the road was not constructed along the street in question until October, 1883, and that the damage suits were not brought until in 1887, and judgments not recovered until August, 1888. If these bondholders were not required to take notice of the right of appellees, and it is necessary to bring notice home to them, evidence thereof is not wanting in this record. They were notified upon the face of the bond and mortgage that the bonds were issued upon an unfinished line

of road; that they were to be issued at the rate of $10,000 a mile, as the projected line of railroad was completed. The mortgage executed to secure these bonds was made to cover, not only the small portion of the road then constructed, but the franchise and property of the railroad company then owned or thereafter to be acquired, and the projected line of road as it might be completed through the city of Centralia. It was apparent on the face of the security that the railroad and property of the company then in existence was not intended as the sole security for these bonds, but the security was to be appreciated and perfected by the acts of the railroad company in the building and completion of the railroad. * * * The railroad company was, in a sense, agent of the bondholders to perfect their security, and the latter must be held bound by the acts of the company in respect of the completion of the road, so far, at least, as such acts can be held to have been clearly within the contemplation of the parties in appreciating and perfecting the security." Id. 144.

It will be observed that the damages referred to had occurred in 1883, and that the parties did not attempt to recover therefor until 1887, and that the mortgage referred to was executed in 1882. What is there said is equally as applicable to the maintenance of the railroad. A railroad quickly goes to ruin without the services of those who keep it up and operate it, and its public functions are as much (if not more) subserved thereby as by the mortgage debt; and that operation is likely to entail hurt to others under circumstances which involve more blame to mortgagees than the injured parties, and such injured parties stand on as equitable a footing as the injured parties in the cases just cited.

A reference to the authorities shows that it was an old doctrine that property not in existence was not at law covered by a mortgage which attempted to embrace after-acquired property, and courts of equity only gradually introduced the doctrine of enforcing such mortgages. Even in this regard complete unanimity does not exist. But courts of equity could not have intended, in enforcing this equitable doctrine as against legal doctrines, to cover such after-acquired property in favor of such a mortgage, at the expense of those who created such property, and who could only look to it and that which it benefited for compensation. And they certainly never could have contemplated that this equitable doctrine (which was hardly as equitable as the prior law doctrine as against third persons) should be invoked in an application for a receiver at the inception of a cause or at any interlocutory stage of a cause, at the expense of innumerable claimants who would thus be deprived of redress for work done and injuries received. It is extremely difficult to reconcile with established principles of equity and justice the doctrine that one who takes a mortgage upon a railroad to be thereafter built has in equity a lien on the road, after it is built, superior to that of the man who is damaged by its construction, or who furnished the labor and materials to build it.

With the equity doctrine thus inclining towards the protection of claimants against railroad property; with the courts leaning against the injustice of seizing a railroad at the expense of a host of claimants, whose bone, sinew, money, and material went to form a thing which had no similar existence at the time the deed of trust was executed; with public policy leaning towards the protection of those who had kept the railroad going, to carry out its public purposes, (the purposes for which it enjoyed the sovereign prerogative of eminent domain, and an exemption from doctrines of trespass applying to others,)—what is a chancellor compelled to do, when an application is made to him to take into custody and run a railroad by means of his receiver?

In cases where a receiver is asked for to operate and construct a railroad a court ought to have the privilege of saying, "No." The running and building of a railroad is serious business, involving large obligations and credit, and much time, and ordinarily the parties ought to be understood to contract without intending that the court should do any such thing. See 19 Amer. Law Rev. pp. 400, 406; Pom. Spec. Perf. Cont. § 312. And when a court is asked to assume this responsibility it ought to have the right to say: "Before I will appoint a receiver, you must agree to pay claims which have helped to keep the concern going, have put and kept it in its present state, have made it useful, and such claims as have grown up within a period to be fixed for damages to persons and property." That is the position taken by the learned court in the

principal case, and, it seems to us, in this regard the court's position is invulnerable.

When a court is called on to restrain the collection of taxes, it requires, as a condition precedent, that the legal taxes should be first paid. 1 High, Inj. (3d Ed.) § 497; 1 Pom. Eq. Jur. (2d Ed.) § 393. When a court of chancery is called on to set aside a usurious contract, it requires as a condition that the legal interest shall be tendered. He who seeks equity must do equity. 1 Pom. Eq. Jur. (2d Ed.) § 391. It would be marvelous, indeed, if chancery courts, when called upon to do so revolutionary a thing as to appoint a receiver of a railroad, (this was the term used to denominate the act in State v. Railroad Co., 15 Fla. 286,) did not have the right to prescribe conditions which, by the consensus of all the cases, without exception, are equitable and just.

That the appointment of a receiver is discretionary is too well settled to admit of dispute. Verplank v. Caines, 1 Johns. Ch. 57; Chicago, etc., Co. v. United States, etc., Co., 57 Pa. St. 83; Hamburgh Manuf'g Co. v. Edsall, 8 N. J. Eq. 141; Nichols v. Arm Co., 11 N. J. Eq. 126; Denike v. Lime, etc., Co., 80 N. Y. 599, 609; Mays v. Rose, Freem. Ch. (Miss.) 703; Leavitt v. Yates, 4 Edw. Ch. 162; Smith v. Railroad Co., 12 Ont. App. 288; Owen v. Homan, 3 Macn. & G. 378, 4 H. L. Cas. 997; Hanna v. Hanna, 89 N. C. 68; Railroad Co. v. Souther, 2 Wall. 510; Overton v. Railroad Co., 10 Fed. Rep. 866; Williamson v. Railroad Co., 1 Biss. 198; Sage v. Railroad Co., 18 Fed. Rep. 574; Mercantile Trust Co. v. Missouri, R. & T. Ry. Co., 36 Fed. Rep. 221; Credit Co. v. Arkansas Cent. R. Co., 15 Fed. Rep. 46, 49; Farmers' Loan & Trust Co. v. Chicago & A. Ry. Co., 27 Fed. Rep. 146; Beecher v. Bininger, 7 Blatchf. 170; Vose v. Reed, 1 Woods, 647; Pullan v. Railroad Co., 4 Biss. 35, 47; Morrison v. Buckner, Hemp. 442.

And the right to make equitable conditions must follow as of course. See, besides the principal case, Turner v. Railroad Co., 8 Biss. 315, 318; Dow v. Railroad Co., 20 Fed. Rep. 260; Fosdick v. Schall, 99 U. S. 235; Morgan's, etc., S. S. Co., v. Texas, etc., Ry. Co., 137 U. S. 197, 11 Sup. Ct. Rep. 61; Railroad Co. v. Humphreys, 145 U. S. 103, 12 Sup. Ct. Rep. 787. Also the decision of Brewer, J., referred to in the principal case.

The orders of the learned judge in the principal case were wise and correct; far more so than the shifting, vague, and uncertain doctrines uttered by other courts. Preceding, as they do, the appointment of the receiver, they establish a clear rule. The refusal to consent to such conditions may none the less make the mortgages amenable to much, if not all, of what is so provided; and the only effect of such a refusal will be to oblige the parties to go forward with foreclosure without a receiver.

The principal case is taken out of the field of debate by the fact that the parties in interest consented in advance to the conditions the learned judge imposed. But the result would have been the same if the order had said nothing about the trustee's assent to its terms; for when a plaintiff applies for the appointment of a receiver, and the court makes the appointment upon terms, the plaintiff is as much bound by the terms as if he had expressly assented thereto. If he declines to accept the receiver on the terms imposed, he must withdraw his application for a receiver.

Little Rock.                                    MORRIS M. COHN.